```
1                    IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF DELAWARE

3

4    WONDERLAND SWITZERLAND AG,        :
                                       :
5                     Plaintiff,       :
                                       :   C.A. No. 18-1990-RGA
6    v.                                :
                                       :
7    EVENFLO COMPANY, INC., et al.,    :
                                       :
8                     Defendant.       :

9

10                                     Monday, November 2, 2020
                                       10:01 a.m.
11                                     Oral Argument
                                       Videoconference
12

13   BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

14   APPEARANCES:

15              ASHBY & GEDDES
                BY:  STEVEN J. BALICK, ESQUIRE
16
                          -and-
17
                FINNEGAN HENDERSON FARABOW GARRETT & DUNNER, LLP
18              BY:  E. ROBERT YOCHES, ESQUIRE
                BY:  BENJAMIN R. SCHLESINGER, ESQUIRE
19              BY:  KARA A. SPECHT, ESQUIRE

20                        -and-

21              WHITE & CASE
                BY:  MICHAEL J. SONGER, ESQUIRE
22              BY:  SHAMITA ETIENNE-CUMMINGS, ESQUIRE
                BY:  BIJAL VAKIL, ESQUIRE
23
                                       For the Plaintiff
24

25
```

1    APPEARANCES CONTINUED:

2             MORRIS NICHOLS ARSHT & TUNNELL LLP
             BY:  JENNIFER A. WARD, ESQUIRE

3                  -and-

4             BAKERHOSTETLER

5             BY:  JEFFREY LYONS, ESQUIRE
             BY:  JOHN M. MUELLER, ESQUIRE

6                       For the Defendant

7

8               ***  PROCEEDINGS  ***

9          THE COURT:  Good morning.  This is Judge

10    Andrews.  Can my deputy clerk hear me?

11          THE CLERK:  Yes, Judge.

12          THE COURT:  And can my court reporter hear me?

13          THE REPORTER:  Yes, Judge.

14          THE COURT:  All right.  So this is *Wonderland*

15    *Switzerland vs. Evenflo*, Civil Action Number 18-1990, some

16    arguments on summary judgment and some expert arguments.

17          And for the plaintiff, Wonderland, Mr. Balick, I

18    see you.

19          MR. BALICK:  Yes.  Good afternoon.  Steven

20    Balick from Ashby & Geddes for Wonderland.  I'm joined by

21    counsel from two different law firms and from the company.

22    From the Finnegan Henderson firm, Robert Yoches, Benjamin

23    Schlesinger, and Kara Specht.

24          From White & Case, Michael Songer, Shamita

25    Etienne-Cummings and Bijal Vakil.  And from the company,

1    Chingting Chen.

2             THE COURT:  All right.  Thank you, Mr. Balick.

3             And Mr. Lyons, you represent Evenflo; right?

4             MR. LYONS:  That's correct, Your Honor.  So Jeff

5    Lyons, BakerHostetler for Evenflo.  With me on the call

6    from BakerHostetler is John Mueller and also Jenn Ward from

7    Morris Nichols.

8             MR. MUELLER:  As well as with the company, Amy

9    Blankenship.

10            THE COURT:  All right.

11            MS. WARD:  Yes.  Good morning, Your Honor.

12            THE COURT:  Good morning, everyone.  So I issued

13   an order saying what I wanted the argument to be about.  I

14   don't know whether the two of you or the two sides talked to

15   each other about exactly how to approach them.

16            Was there any conversation along those lines?

17            MR. MUELLER:  No, Your Honor.

18            THE COURT:  Okay.  Well, then why don't we start

19   with -- actually, why don't we start with the plaintiff.  So

20   go ahead.

21            MR. SONGER:  Good morning, Your Honor.  This is

22   Mike Songer from White & Case.  Can everyone hear me okay?

23            THE COURT:  I can.

24            MR. SONGER:  Good.  I'll be handling points one

25   and two in the order that you sent around regarding the oral

1    argument.  And let me start with the anticipation arguments

2    and why summary judgment of no anticipation is appropriate.

3            Of course, you've read the briefs and everything

4    that's in there.  There's two main arguments as it relates

5    to the '117 and '725 patents.  There's this issue of there's

6    no movable guide bar or lock bar within the prior art.  And

7    on the '294 patent, you get into the issue of the harness

8    storage cavity.

9            And let me just briefly go over those, but let

10   me start with the notion -- and Ben, if you want to go to, I

11   believe, Slide 13 on these.  And the first notion is, Your

12   Honor, that the defendants here have already acknowledged

13   that there's no anticipation because the prior art does not

14   literally teach the structures in the patent claims.

15           And I've put up one part from the expert report.

16   The same statement is said for all of the claims that are

17   there.  But here the expert says he doesn't believe the

18   structure disclosed in the prior art literally teaches the

19   identical corresponding structures in the '117 patent

20   claims.  And again, he says this for all of the patents.

21   And that, of course, is the gravamen of anticipation.

22   You've got to have the prior art that teaches and is present

23   for all of the elements of the claims of the patent.  And

24   there's also -- there was a statement in the deposition

25   where he admitted that he believes the claims are not

1    infringed, but also not anticipated by the prior art.

2         So we start out with a clear acknowledgment from

3    their own expert that the prior art does not have the

4    identical corresponding structures.  And I would contend

5    that is enough, that admission from their expert is enough

6    to find that there's no anticipation.

7         And if you want to go into the specifics of what

8    we have as respects, let's first turn to the movable guide

9    bar and the parts that relate to that.  And this one is

10   pretty simple, and I believe, Ben, it's slide 21.  We can

11   show this.

12        So here you have -- this relates to the '117 and

13   the '725 patents.  And here you have in the '117 patent, and

14   this is just shown illustrative by example one.  You have a

15   movable guide bar or a lock bar.  The '117 patent talks

16   about it as a movable guide bar.  The '725 patent calls it a

17   lock bar, but there's no dispute that they're the same

18   element there.

19             And --

20        THE COURT:  Remind me, Mr. Songer, are the

21   specifications of the '117 and the '725 identical?

22        MR. SONGER:  I believe they are, Your Honor,

23   that they're identical and they have that.  So --

24        THE COURT:  Okay.

25        MR. SONGER:  -- of course, as it relates to

1  these elements, there may be different parts of this that

2  aren't pertinent to this discussion.  So but here you have,

3  if you look at the guide bar, and it really gets down to the

4  green on the left there versus that track channel in the

5  prior art.  And that is not a bar.  It is a track that those

6  blue -- two blue pieces sit in.  It's a channel that's

7  there, and the two pieces sit into that.

8           Now, during the deposition, if you go to the

9  next --

10          THE COURT:  Well, I'm sorry.  When you say,

11  Mr. Songer, that the two pieces sit in the channel, I guess,

12  first off, the -- and we haven't taken apart any of the

13  various car seats that we've been given to look at, but

14  the -- and of course, you're talking about a drawing here.

15          MR. SONGER:  Right.

16          THE COURT:  When you say channel, is that

17  essentially a space or a track?  Is that a gap, a space,

18  something like that?

19          MR. SONGER:  Yes, it is.  It's an indentation

20  into it.  It's not enclosed in any way.  It's an open

21  indentation space, kind of like a sideways U.  It's hard for

22  us to do this on Zoom, but that's --

23          THE COURT:  Well, so but you say that there's

24  something that sits in it.

25          MR. SONGER:  There are those two blue pieces

1    that you see there that are not connected that hold the

2    locking pins.

3                   THE COURT:  So what are the two blue pieces?

4                   MR. SONGER:  In the prior art, those are pieces

5    of plastic, and they move to engage the locking pins on the

6    side.  And in fact, when you take it apart, they kind of

7    fall out of the channel and dangle there.

8                   THE COURT:  How are they -- so you say "dangle."

9    So in some way they're connected to something?

10                  MR. SONGER:  Yes.  They're in the slot and

11    they're -- when you lock them at the ends on the guide

12    rails, Your Honor, they're locked in there.  But if you were

13    to take it apart, you can take those right out.

14                  THE COURT:  All right.  And is it your

15    understanding that the argument of the defense expert is

16    that it's not the blue pieces that disclose a bar, it's the

17    empty space?

18                  MR. SONGER:  Correct.  It's the channel or the

19    track, I believe, he calls it, which is behind that.  So --

20                  THE COURT:  All right.  Does the track or the

21    channel move?

22                  MR. SONGER:  No, it does not, Your Honor.

23                  THE COURT:  But on the '117 patent, your green

24    bar, how does that move?

25                  MR. SONGER:  Oh, let me rephrase that, Your

1    Honor.  The track and the channel -- I apologize.  I

2    misunderstood your question.

3                    In the prior art, in the red, that track and

4    that channel, that piece will go up and down.  The channel

5    is -- it's located in that red piece, and as that red piece

6    moves, the channel will move.

7                    THE COURT:  So when you say "red piece," on my

8    screen, there's what I would call a brown piece, but that's

9    what you're talking about is the -- what you've got labeled

10   as the Wonderland opposition brief, page 8?

11                   MR. SONGER:  Correct.

12                   THE COURT:  That what you're saying is that what

13   you've described as the channel is fixed relative to what I

14   guess is called the head rest plate?

15                   MR. SONGER:  Correct, Your Honor.

16                   THE COURT:  But it's movable in the sense that

17   the head rest plate is movable?

18                   MR. SONGER:  Yes.  Yes, it is.  And I apologize

19   for misstating that.  I was thinking whether the channel

20   itself could separately move.

21                   THE COURT:  Okay.  Well, no, I mean, it's

22   important, obviously, to be accurate, but it's also

23   surprising how what you would think is fairly simple

24   technology is hard to completely comprehend.

25                   MR. SONGER:  And articulate via videoconference

1    as well, Your Honor.  But to answer -- your second question

2    was:  Does the bar move on the '117 patent?  Yes, it does.

3    It will go along and move up with the various things.  So --

4              THE COURT:  All right.  And so basically putting

5    not too fine a point on it, you're saying a channel, an

6    indentation, that's not a bar?

7              MR. SONGER:  Correct.

8              THE COURT:  Okay.

9              MR. SONGER:  Correct.

10             THE COURT:  So to the extent we're talking about

11   a limitation that is movable guide bar, it's not a bar, but

12   it is movable in the same -- in the relevant sense?

13             MR. SONGER:  Yes.  The plate that's brown on

14   Your Honor's screen is movable, but it is not a bar.

15             THE COURT:  Okay.  But that's a key point you're

16   trying to make is it's not a bar?

17             MR. SONGER:  Yes, Your Honor.  And it's not just

18   myself that's making it.  Then if you go to the next slide,

19   this was also acknowledged and admitted by the expert where

20   you have, again, this channel, the discussion about it is --

21   the channel is a bar.  He says it provides the function, but

22   it's not a separate bar.  And he repeats that again.

23             THE COURT:  Yeah.  So you know, he only half

24   answered the question, and there's no followup here; right?

25             MR. SONGER:  Correct, Your Honor.  But it's --

1    but we're talking on this issue of for anticipation and the

2    element, does this channel -- would it be a bar or a track,

3    and would it be a bar?  And he said, "No."  I don't know

4    what he means by a separate bar, frankly.  I think that's a

5    distinction without a difference, whatever he means there.

6              THE COURT:  But it's something -- particularly

7    the way you've just shown that it's kind of fixed into the

8    head rest plate, presumably what he actually means is as

9    compared to the '117 where it seems to be more independent.

10   Here, it's not independent because it's part of a bigger

11   piece; right?

12             MR. SONGER:  Correct.  Correct.  It's not a

13   separate bar that has the latches on it that go and move up

14   as a separate piece.  This is an indentation and has two

15   other separate pieces that fit within it as that -- in that

16   channel or that track.  So --

17             THE COURT:  But you couldn't get the expert

18   because in the end you didn't press to say it's not a bar?

19             MR. SONGER:  He just said it's not a separate

20   bar.

21             THE COURT:  Yeah.  Okay.

22             MR. SONGER:  So -- and that really on -- that's

23   our position, Your Honor, on the '117 and the '725 patents

24   as it relates to it.  I'm not going to belabor the briefs

25   and the positions unless Your Honor has additional

1    questions.

2            THE COURT:  No, that's all helpful.

3            MR. SONGER:  Now, let's move to the '294 patent

4    and the harness storage cavity, and Your Honor asked a

5    question about claim construction with this as well with the

6    harness storage cavity.

7            THE COURT:  Yeah.

8            MR. SONGER:  Ben, if you can go to the next

9    slide.  So to me the -- and we wrote this in our brief,

10   the -- to the extent construction is necessary, it's clearly

11   a space or a volume for storing harnesses.  And that's

12   supported by the claims themselves.  The first places you

13   look when doing claim construction, the claims, the

14   specification, it's all there.

15           And to situate the argument, Your Honor, it's

16   very simple actually --

17           THE COURT:  So Mr. Songer, I guess the first

18   thing is, and I'm going to ask this question, but tell you I

19   actually have read the briefs.  So this is -- but it's not

20   necessarily all completely clarified in my mind here.  The

21   first time around at the Markman, did I say a harness

22   storage cavity doesn't need construction, or did we just not

23   construe it?

24           MR. SONGER:  I believe it was not construed,

25   Your Honor.  I was not there, and Mr. Yoches can correct me

1    if I'm wrong or Mr. Mueller, but I believe it was not

2    construed.

3              THE COURT:  Because no one asked me to?

4              MR. SONGER:  Correct.

5              THE COURT:  Okay.  All right.  Well, that's

6    good.

7              So what is Wonderland's position on a

8    construction?  Is it your position that I need to construe

9    it, or is it your position that it just has its plain and

10   ordinary meaning, whatever that might be, and you can kind

11   of figure out what's required by the rest of the claim?

12             MR. SONGER:  Well, given the positions that were

13   taken in the summary judgment briefing by defendants, Your

14   Honor, I think you would need to construe this.

15             THE COURT:  Well, and to construe it as what?

16             MR. SONGER:  Construe it as a -- the harness

17   storage cavity is a volume or space for storing harnesses or

18   a cavity that stores harnesses, something that explicitly

19   spells out it's there to store the harness.

20             THE COURT:  So capable of storing harnesses?

21             MR. SONGER:  Capable doesn't get you there, Your

22   Honor, because that's this notion of you can have any void

23   in the back of the seat, that you can shove a harness in

24   that would be capable of it, meaning it's sized to fit it or

25   you can jam it in there.  But that's not what the patent

1    discloses.

2             THE COURT:  Well, so that's what I'm trying to

3    do because I think, you know, the -- because it was in the

4    context of a summary judgment motion.  I don't remember

5    there being in the briefing something that would be the

6    equivalent of what I would see in a claim construction brief

7    of harness storage capacity, and then there would be so many

8    words as to what I was supposed to construe it as.

9             And when you say volume or space for storing

10   harnesses, so to speak, is that your final answer?

11            MR. SONGER:  Yes, Your Honor.  And just to

12   situate it, I appreciate that you read the briefs.  But in

13   our opening briefs, it's starting at page 16 and 17 where we

14   go through what the claims recite, and then we go through

15   the specification, what is there, and the prosecution

16   history.  That would be the support for our position.

17            THE COURT:  Well, but so the request here is to

18   construe a harness storage cavity as a "volume or space for

19   storing harnesses."  And then that's going to lead, in your

20   view, to knocking out the claim here.  And so, I guess in a

21   claim construction world, where I'm having trouble is the

22   volume or space.  Its function is to store harnesses.

23            That's what you would say?

24            MR. SONGER:  Correct, Your Honor.

25            THE COURT:  And does that mean it can't have any

1    other function?  I mean, I take it the answer has to be no.

2              MR. SONGER:  Correct.

3              THE COURT:  All right.  So in any event, why

4    don't you go to why the prior art doesn't have this.

5              MR. SONGER:  Well, because two main reasons.

6    First of all, the prior art, the SafeGuard seat wasn't

7    designed to be put into this booster mode where you need to

8    get rid of the harnesses.  That's the first one.  It simply

9    was not contemplated as having that.

10             The argument from defendants are, Well, there's

11   a space back there, and it will fit the harnesses.  It

12   wasn't designed that way.  It wasn't meant to do that, but

13   you can put them in there.  And in our view, that does not

14   meet the claim limitation.

15             The second argument is that there's also

16   evidence that in order to get it fit, and the patent talks

17   about it, you've got the crotch strap coming up.  And when

18   you store that, you can disconnect the crotch strap and put

19   it in the harness storage area.  To make that work on the

20   prior art SafeGuard seat, you actually have to cut that

21   crotch strap.  And of course, once you cut it, you can't

22   then put it back.

23             THE COURT:  Right.

24             MR. SONGER:  So -- and there's evidence in the

25   record and in the briefs for that as well.  So this --

1    THE COURT:  So basically what you're saying is

2    in the SafeGuard, you can't -- because in the SafeGuard the

3    straps that would come over the shoulders, they are directly

4    connected to the part of the strap that's the crotch guard;

5    right?

6    MR. SONGER:  No.  The crotch guard comes up

7    separately.  They're connected through the latch, the

8    harness point latch thing.

9    THE COURT:  Okay.  So there's like a belt kind

10   of thing, a latch somewhere in the middle where the stuff is

11   coming down.  The shoulder harnesses meet up with the

12   crotch.

13   And is there also -- on the SafeGuard, is there

14   also waist -- is it five point or is it three point?

15   MR. SONGER:  I believe it's five point, Your

16   Honor.

17   THE COURT:  Okay.  And so the crotch and the

18   waist part, are they -- is the waist one connected to the

19   crotch one?

20   MR. SONGER:  Correct.  So the crotch one would

21   come up from the bottom and latch in there.  And when you

22   convert it, that can't fit in that storage space unless you

23   cut that webbing and then place it back there.

24   THE COURT:  Okay.  All right.  And if the

25   harness storage -- if the space on the SafeGuard could store

1    some of the harnesses, but not all of the harnesses, would

2    you say it discloses a volume or space for storing

3    harnesses?

4              MR. SONGER:  No, Your Honor.

5              THE COURT:  Why not?

6              MR. SONGER:  Because it's not designed to do

7    that.  It is simply a void that you can stick the harnesses

8    in.

9              THE COURT:  Well, I guess my question or what I

10   was driving at more was:  If for whatever level of design it

11   only stored some of the harnesses, but not all of the

12   harnesses, would that make a difference or is your argument

13   really just -- well, I guess what I'm trying to do is figure

14   out whether the fact that, in your view, it won't store the

15   crotch guard, whether that's the end of the story or whether

16   then we still have to decide whether or not it can store the

17   harness guard, the harness, the upper part, whether then it

18   discloses the limitation.

19             MR. SONGER:  Right.  Your Honor, that's -- to

20   answer that question, let's go back to the purpose of the

21   patent.  The purpose of the patent is to allow yourself to

22   convert from the child seat into a booster seat where you

23   don't have any of the harness, you just have the seat, and

24   you use a regular seat belt when the kids are older.

25             THE COURT:  Yeah.

1          MR. SONGER:  But if you want to, you can then

2    reuse the seat -- and of course, these are expensive

3    seats -- for the next child and open the harness storage

4    cavity and convert it back into a safety seat with the

5    five-point harness.  So it's -- that's why it's there, so

6    that you can store them, but you're not getting rid of them.

7    You don't risk losing them.  They're right there in the seat

8    behind in the harness storage cavity.  And then whenever you

9    want to use them again, you can take them out and put the

10   seat in and have a useable seat.

11          And to answer your question about the crotch

12   strap, obviously, in the SafeGuard seat, when you want to do

13   that, you've rendered the seat unusable for its purpose.  So

14   I'm coming back into a regular old car seat, child car seat

15   because you may be able to attach the shoulder and the belt

16   harnesses, but you're not going to have any crotch strap

17   because it has been cut.

18          So that's the purpose behind the patent is to

19   allow it, and that's the purpose behind the cavity, to have

20   a storage space for the harness for that.  And the claim

21   here sets out the other parts of it, just illustrative of

22   the '294 patent, claim 1.  So that they can fit beside

23   there, and the child is not sitting on these lumpy harnesses

24   and what's there.  It's back behind the cover.

25          But then you can convert it back again, which is

1     why the claim -- and this is throughout the patent, and

2     that's why the claim language is -- a volume or space for

3     storing harnesses is important.  And to answer your direct

4     question, Your Honor, no, if you can just store part of

5     them, that's not enough because --

6                  THE COURT:  So really your claim construction is

7     a volume or space for storing all harnesses?

8                  MR. SONGER:  Correct.  You could say that.

9                  THE COURT:  Well, I mean --

10                 MR. SONGER:  I mean, I don't think --

11                 THE COURT:  -- I'm just trying to --

12                 MR. SONGER:  Yes.

13                 THE COURT:  -- make sense of what you're arguing

14    here.  Would you say that?

15                 MR. SONGER:  I would say that.  You can -- the

16    patent does talk about storing, for example, the crotch belt

17    which is not -- the crotch strap rather, which is not

18    present in the prior art.  So I would say that I don't think

19    it's necessary, but if you're asking me would I accept that,

20    yes, I would.

21                 THE COURT:  Well, I'm not -- so, you know, I

22    haven't obviously heard from the defendant yet, but partly

23    I'm just trying to figure out -- well, I'm just trying to

24    figure out what your argument is.

25                 Okay.  Do you have anything more on the harness

1    cavity?

2            MR. SONGER:  Very briefly, Your Honor.  If we

3    can go to the harness cavity, the Nakagawa patent, the next

4    slide, we've argued in our brief that, again, the expert's

5    admission, the harness storage cavity has to be formed in

6    the shell.  And the shell was identified by the expert as

7    the blue piece 200 and then some of the 100, some of the

8    seat bottom parts.  The Nakagawa is the one where you have

9    the existing car seat that kind of folds out into a baby

10   seat as well.  It's not a separate device.

11           And our position here is that based, again, on

12   the expert's testimony, the harness has to be formed in the

13   rigid shell.  And Nakagawa does not anticipate because by

14   their expert's admission, that storage cavity is not formed

15   in that shell based on how we identified the shell.

16           THE COURT:  So basically what you're saying is

17   the Nakagawa has a harness storage cavity -- has a storage

18   cavity.  It has a cavity for storing harnesses; right?  What

19   you're saying is that there's another limitation that's

20   missing from Nakagawa?

21           MR. SONGER:  Correct.  The limitation being it

22   has to be formed in the shell.  That's correct, Your Honor.

23           THE COURT:  Okay.  And I guess I'm looking at

24   the slide that's up right now, and the little box is saying

25   Evenflo rigid shell, Evenflo harness storage cavity.  That's

1    what you're saying that Evenflo's argument is?

2              MR. SONGER:  Correct.  That was identified by

3    the expert as the harness storage cavity and the rigid

4    shell.

5              THE COURT:  And the reason why the blue item is

6    not a rigid shell is what?

7              MR. SONGER:  No, the blue item, according to

8    Evenflo, is a rigid shell, but it doesn't have the

9    limitation of having the storage cavity formed in the rigid

10   shell.

11             THE COURT:  Oh, because it's formed in the other

12   part of the device?

13             MR. SONGER:  Yes, Your Honor.  That's just a

14   cover there.  But the blue part which Evenflo identifies as

15   the rigid shell is the cover that would go in the spaces

16   behind that cover.  It's not formed in it.  So that's the

17   argument on harness storage cavity and Nakagawa.

18             THE COURT:  Okay.

19             MR. SONGER:  There's one final argument on

20   Nakagawa that doesn't relate to the -- relates tangentially

21   to the harness storage cavity.  And Ben, if you can go to

22   slide 27, please.

23             And it's this argument of shoulder straps

24   projecting or protruding from the slots which is another

25   claim limitation.  And this may help just situate Your

1    Honor.  I found it useful when I was going through it.

2              So you have -- in this car seat, you've got the

3    webbing and the shoulder straps in red, and the belt straps

4    in blue.  And you see they combine in that -- and the crotch

5    strap comes up the middle there, and they combine in that

6    five-point harness that's in the middle there.

7              And these are -- the blue and the red, although

8    they're different because one goes over the belt and one

9    goes over the shoulder, they're actually the same piece of

10   webbing there that gets moved in.

11             And then the next slide, Ben.

12             And with Nakagawa, you see the similar feature

13   there.  You've got the belt straps at the bottom that go

14   around the belt and latch into that harness and the shoulder

15   straps.

16             But then when you go to -- the next slide.  When

17   you put that cover on, that cover 200 that we saw, you do

18   not see the shoulder straps projecting from the slots out of

19   the top.  You can only see the blue part which are the belt

20   straps.  The cover completely encompasses the shoulder

21   straps, and they do not project or protrude out of the slots

22   in the cover.

23             THE COURT:  So which one in Figure 2 of Nakagawa

24   here, what is supposed to be the slots?

25             MR. SONGER:  There are none, Your Honor.  That's

1    the point.

2                    THE COURT:  So where are the shoulder harnesses?

3                    MR. SONGER:  It's back behind that cover 200

4    where you can't see.  So you have --

5                    THE COURT:  But I guess what I'm -- so you can't

6    see them.  If you could see them, where would they be?

7                    MR. SONGER:  They would be near the top because

8    that's where the shoulder straps are.  Some were up there.

9                    And if you don't mind, Your Honor, Ben, if you

10   could go back to the prior slide which will help situate it.

11   So here you see your shoulder straps in red and the belt

12   straps in blue before you put the cover on.  Right.

13                    THE COURT:  But see, maybe this is what you're

14   trying to teach me here.  But in this figure, it appears as

15   though the red shoulder straps are coming out of slots,

16   doesn't it?

17                    MR. SONGER:  Yes, but that's back in the seat

18   mechanism.  That's not out of the storage cavity.

19                    THE COURT:  Oh, okay.  So what you're saying is

20   the slots are in the wrong place?

21                    MR. SONGER:  Correct.  Then if you cover it --

22   then the next slide, Ben.  When you cover it, I've now

23   covered that storage cavity, and the slots need to come out

24   of that cover.  And you don't see any of the red shoulder

25   straps, you just see the blue.

1          So they would have to come out of -- the slots

2     in the cover of the harness storage cavity, to have them

3     project out, they would have to be at the top there.

4               THE COURT:  Okay.

5               MR. SONGER:  Okay.  So those are the

6     anticipation arguments and the harness cavity storage

7     Markman construction that Your Honor wanted to discuss in

8     point one.

9               THE COURT:  All right.  Is this a good time to

10    go over to Evenflo's counter arguments on this?

11              MR. SONGER:  Yes, it is.

12              THE COURT:  All right.  Let's do that then.

13              MR. LYONS:  Hi, Your Honor.  Jeff Lyons for

14    Evenflo.

15         So a lot of points to touch.  I'll try to go in,

16    I guess, more recency versus primacy.  For Nakagawa, they

17    just admitted that the harness straps and the belt straps

18    are a single piece of webbing.  So their orange versus blue

19    is really just where they've slid this buckle.

20         And their figure also shows that those harnesses

21    then project from the cover, underneath the cover through

22    slots presumably.  How else would they get out?  So we think

23    there's at least an issue of fact as to whether, you know,

24    they require this distinct, separate harness.

25              You know, shoulder straps versus belt straps,

1    it's really just one piece of webbing.  So the distinction

2    where, you know, they have that the break is, you know, a

3    slideable, you know, buckle.  So there's really no

4    difference.  We think there's at least a question of fact

5    there as to whether, you know, they have to have multiple

6    points that are projecting out of this cover or if

7    underneath where you saw the two orange lines, if that's

8    sufficient to meet the limitation.

9         Also, for Nakagawa, when they say that we've

10   admitted that the rigid shell is the cover, and then the

11   orange or brown part underneath is the cavity, the orange or

12   brown part is the cavity.  But it's also formed in

13   something, and that something is hard.  I think they call it

14   like a resin board or something in the patent.  And so that

15   is the rigid shell.  The cover forms part of that shell.

16        The cavity is formed beneath that into

17   something.  It can't just be formed into nothing.  It's not

18   formed in, you know, padding or cushion of a seat.  So that

19   part that is the rigid shell is all of that.

20        THE COURT:  So when Mr. Songer was showing

21   something and saying that your expert said that the

22   detachable part was the shell and the other thing was, I

23   guess, not, does your expert say what you've just said, or

24   is there something wrong with what plaintiffs said the

25   expert said?

1          MR. LYONS:  So I believe that in the opening

2     invalidity report, essentially our expert did what is

3     essentially an invalidity chart for these patents.  And in

4     that, they identify the various structures in Nakagawa, and

5     I think it's -- 200 is the cover.  206 is the cavity itself.

6     But then also he's saying that it's met there because that

7     cavity is formed in something.  So I believe it's at least

8     in the opening.

9          I'd have to pull -- I don't think it's -- he

10    doesn't identify exactly the number of the -- you know, the

11    item or the limitation there.  I don't think that Nakagawa

12    explicitly defines what that harness storage cavity is made

13    out of.  It's just, you know, there's this hard back on the

14    seat.  There's a cavity there.  So it has to be formed in

15    something hard to be a harness storage cavity.  If it was

16    formed in something soft, it wouldn't work as intended.

17         So I believe that's what he's trying to point

18    out.  I don't know if it's as clear as I would like it to

19    be, but that is what he said at least in the opening report.

20         THE COURT:  Okay.  So basically I forget, did

21    your brief cite a paragraph in the opening report where he

22    said more or less what you've just said?

23         MR. LYONS:  Yeah.  Let me just -- I will find

24    that, Your Honor.

25         THE COURT:  Well, if you tell me it's there --

1     well, sure, tell me where it is.

2               MR. LYONS:  Our -- I believe it's our answering

3     brief in response to their motion, page 28.  It says the

4     rigid shell of Nakagawa includes back piece 200 as well as

5     the seat back panel 30.

6               THE COURT:  Okay.  And the seat back panel 30 is

7     what you're now pointing to as the rigid shell; is that

8     right?

9               MR. LYONS:  Yeah, into which the harness storage

10    cavity is formed.  Correct.

11              THE COURT:  Okay.  All right.  Did your expert

12    say anything about this during deposition?

13              MR. LYONS:  I don't believe that Nakagawa came

14    up at the deposition.

15              THE COURT:  Okay.  All right.  Go ahead.

16              MR. LYONS:  Okay.  So going back, I do want to

17    say Mr. Songer mentioned multiple times that the SafeGuard,

18    in order to fit all the harness components into what we've

19    identified as the harness storage cavity, you have to cut

20    the crotch strap.  And that's true.  You know, it wouldn't

21    reach into that cavity without cutting it.

22              But his argument is then the seat must

23    reconvert.  And that's the purpose of this patent is you can

24    have a seat that converts to a booster, and then can

25    reconvert back into a five point, you know, harness system.

1    The specification of the '294 mentions reconverting back

2    into a regular seat, a non-booster seat.  It was never

3    claimed.  So the fact --

4              THE COURT:  Well, so are you telling me that

5    your argument as to why it meets the limitations is because

6    you can cut the crotch strap and stick it in the harness

7    cavity?

8              MR. LYONS:  Partially.  So two points to that.

9              One, the only time that the claims require that

10    the crotch strap actually be in the harness storage cavity

11    is the method claims which are 13 through 16.  Otherwise,

12    the harness storage cavity, as we -- just has to have the

13    capability of storing these things.  So you never actually

14    have to place the crotch strap into the harness storage

15    cavity except for the method claims which are converting the

16    seat to a booster mode.  For the --

17              THE COURT:  So --

18              MR. LYONS:  I'm sorry.

19              THE COURT:  Sorry.  I was going to say, but it

20    cannot be the case, can it, that you destroy the product and

21    that's how you meet the claim?

22              MR. LYONS:  Well, we don't think it destroys the

23    product.  We cited a few cases.  Let me just get there in my

24    power-point.  So that came up.

25              They said we destroyed the seat for its intended

1    purpose, and they cite some cases.

2              THE COURT:    You can skip the intended purpose.

3    But it's like if you invented a three-legged chair, and you

4    said, Well, here's a four-legged chair.    That anticipates

5    because you could break off one of the legs.

6              MR. LYONS:    I don't think the chair would work

7    for what you're trying to make it to do, a three-legged

8    chair.    The legs would be in the wrong position.    You would

9    have a chair that would tip backwards in the leg you broke

10   off.

11             Here, you cut the strap to convert it to a

12   booster mode.    You're not using that strap anymore.    The

13   booster mode uses the car seat belt to go across.    You no

14   longer need that crotch strap.

15             In the accused product, you take that crotch

16   strap off.    It's just, instead of cutting it, it has a

17   removable, you know, switch where you can pull it out.    So

18   we're saying -- so essentially the same thing.

19             Here, you take the crotch strap off.    You put it

20   on the harness storage cavity, and you use the seat as a

21   booster.    The only difference being for the SafeGuard, we

22   admit you can't reconvert it back unless you sew the crotch

23   strap back on.    But the patent never claims reconverting

24   back to a non-booster seat.    They mention it in the

25   specification, but they never claim that part.

1          THE COURT:  And so the method claims which I

2    think you've said do claim the converting back, what do you

3    have to say about them?

4          MR. LYONS:  They claim converting to a booster

5    mode.  They do not claim converting back to a non-booster

6    mode.  So those are the only claims that require you to

7    actually place the crotch strap into the harness storage

8    cavity.

9          THE COURT:  So to convert for the method claims,

10   Mr. Lyons, somebody would have to actually cut the strap,

11   cut the crotch strap; is that what you're saying?

12         MR. LYONS:  Yeah, I believe so.  Yes, Your

13   Honor.

14         THE COURT:  So is there any evidence that

15   anyone's ever done that?

16         MR. LYONS:  We don't have any evidence that

17   anyone did that prior to, you know, us in this case.  In the

18   briefs we do cite some cases that say if an expert or a

19   person of ordinary skill would have once envisioned this

20   configuration, then it can still anticipate.  And we think

21   that's at least demonstrated by our expert's testimony and

22   via deposition testimony from some Evenflo employees who had

23   said once the EveryStage was essentially complete, it's

24   nearly at the end, they wanted to know what to do with these

25   harnesses.  And they saw that, well, there's this cavity

1  formed when you raise the head rest up, and you know, it's

2  behind that panel.  And they're just like, Oh, we'll, just

3  put it in there.  It was like a lunch meeting.  I think it

4  was --

5              THE COURT:  Right.  I remember reading about it.

6              MR. LYONS:  So that at least shows a question of

7  fact that, you know, an expert or a POSA may have once

8  envisioned that you could do that, you could remove that.

9              THE COURT:  Okay.  All right.  So the question

10  of claim construction for harness storage capacity, what do

11  you have to say about that?

12             MR. LYONS:  The briefs focused on these cases

13  that distinguished between capability, does something

14  anticipate if it is capable of doing something or does

15  something have to be configured?  And here, I don't think

16  the claim language meets what, I guess, the cases say is

17  configuration.

18             And the main case cited by Wonderland, Ball

19  Aerosol, they said infringement was found to occur only if

20  the accused product was configured with the cover, which had

21  never been used as a base, being used as a base underneath

22  the candle holder.  So you essentially had to take apart

23  this invention and put it in a way that was not the intended

24  purpose or would not work that way.

25             Here, that's not the case with the harness

1    storage cavity.  It says a cavity sized to receive the

2    harnesses is essentially what we say.  It is sized to

3    receive these harness storage cavities in that it can fit

4    all of these harnesses and buckles.

5              MR. MUELLER:  Your Honor, this is Mr. Mueller.

6    Real quick --

7              THE COURT:  Yeah.

8              MR. MUELLER:  -- I do want to say one thing on

9    this because it came up, and Mr. Songer seemed to agree with

10   you on a construction for the harness storage cavity, that

11   it have no other purpose than to store harnesses.  And I

12   just wanted to say that we would agree with that as a

13   construction for the harness storage cavity.

14             THE COURT:  Okay.  So do you or Mr. Lyons -- I'm

15   still not entirely -- what is your position on whether or

16   not I need to construe harness storage capacity?  And if so,

17   what is it that I should tell a jury?

18             MR. MUELLER:  I think that's exactly it, Your

19   Honor.  To the extent that you construe a harness storage

20   cavity to be a storage cavity with no other purpose than for

21   storing harnesses, that would be an appropriate way to tell

22   that to a jury.

23             THE COURT:  All right.  So Mr. Songer said

24   "volume or space for storing harnesses."  That was his

25   proposed construction.  Can you tell me, in so many words,

1    what is your proposed construction?

2            MR. MUELLER:  Just the addition with no other

3    purpose, but for storing harnesses.

4            THE COURT:  So yours would be volume or space

5    for storing harnesses with no other purpose or let's say

6    function other than to store harnesses?

7            MR. MUELLER:  Correct, Your Honor.

8            THE COURT:  Let me just, while we're on this

9    point, ask Mr. Songer what he thinks of the additional

10   language with no other purpose other than to store

11   harnesses.

12           MR. SONGER:  I don't agree with the limitation

13   there because, you know, it's clear from the patent that it

14   stores the harnesses, and I don't know where they would get

15   that it would only have the purpose of storing the harness.

16   So for example, there may be -- that space may -- you may

17   have the head rest mechanism to move, and that's why that

18   space is there that you can also store, but that space is

19   for the storing harnesses.

20           So I would object to only for the purpose of.

21   And I don't believe I said that, but if I did --

22           THE COURT:  No, I don't think you did.

23           MR. SONGER:  Yeah.

24           THE COURT:  So how big in terms of inches does

25   the harness storage cavity need to be in order to meet this

1    purpose of storing harnesses?

2                 MR. SONGER:  Who are you directing that to, Your

3    Honor?

4                 THE COURT:  Anybody who has an answer.

5                 MR. MUELLER:  I don't think that ever has been

6    testified to or otherwise discussed, Your Honor.

7                 THE COURT:  Well, how big is it on the

8    SafeGuard?

9                 MR. MUELLER:  About the same size as it is on

10    the EveryStage.  I think about four inches by five inches.

11                 THE COURT:  And how deep?

12                 MR. MUELLER:  I would guess it's about an inch

13    and a half or two.

14                 THE COURT:  So you could store a juice box or

15    something in there?

16                 MR. MUELLER:  Certainly.

17                 THE COURT:  On either the EveryStage or the

18    SafeGuard, is it a fairly easy maneuver to access the

19    harness storage cavity?

20                 MR. MUELLER:  It's a little easier on the

21    EveryStage.  The EveryStage has a panel that is hinged that

22    makes it a little easier to get to on the -- because that

23    hinged panel exists on the EveryStage for something called

24    the in seat recline mechanism.

25                 On the SafeGuard, the panel is flat.  It's not

1    hinged in the same way.  So in order to access the harness,

2    the cavity, you have to lift up the head rest to a higher

3    level and then put the harness members in that.

4              Now, I just want to say with respect to the

5    definition of harness storage cavity, Your Honor, on the one

6    hand, plaintiff seems to want to exclude a cavity that is

7    capable of storing harnesses.  But on the other hand, they

8    seem opposed to a construction where the cavity was designed

9    or was -- its purpose was to store harnesses.  And I don't

10   understand how they can have both of those opinions.

11             MR. SONGER:  May I interject, Your Honor, now?

12             THE COURT:  Sure.

13             MR. SONGER:  Sure.  I think we go back to the

14   claims is how we can do it, and this answers your size

15   argument as well.  Claim 1 of the '294 patent clearly says

16   the harness storage cavity is sized to receive the latch

17   members and the harness buckle below the cover.  So that

18   tells you the parameters of the size that's there.

19             And it says nothing about a purpose or a need

20   for purpose.  And to add that limitation would be adding in

21   again, as I said, that if by chance something else goes down

22   into that void that's there, they would want to argue no

23   infringement on it when that's not present in the -- that

24   limitation is not present in the claims.  The claims very

25   clearly lay out what the harness storage cavity is and how

1    it's sized.

2                 MR. MUELLER:  And Your Honor, real quick.

3                 THE COURT:  Sure.

4                 MR. MUELLER:  And my response would be that the

5    claims, you can't have it both ways.  You can't say that, on

6    the one hand, it only needs to be sized in order to store

7    the harness pieces and then say, if it is sized to store the

8    harness pieces as the SafeGuard storage area is, that it

9    does not meet the limitations of the claims for another

10   reason.  It doesn't make any sense.

11               THE COURT:  All right.  So this is not final,

12   but I tend to think that I'm not going to be construing

13   harness storage cavity to be "volume or space for storing

14   harnesses with no other purpose other than to store

15   harnesses" because it seems to me that from what I've heard,

16   the existence of a harness storage cavity is diagnostic as

17   to whether it does something else other than store

18   harnesses.  And so I'm unlikely to go with the defendant's

19   definition or construction there.

20             All right.  Well, let's go back to -- is there

21   anything more to talk about on harness storage cavities,

22   Mr. Mueller or Mr. Lyons?

23              MR. MUELLER:  No, Your Honor.  I think that's

24   okay on that issue.  I think Mr. Lyons wants to talk about

25   the guide bar.

1          THE COURT:  Sure.  All right.

2          Well, let's go to the guide bar, Mr. Lyons.

3          MR. LYONS:  All right.  Thank you, Your Honor.

4          So as Mr. Songer correctly noted, what we call

5    the movable guide bar in the SafeGuard does move.  It

6    doesn't move separately.  It moves along with that panel

7    that's in the back.  Let me see if I can find --

8          THE COURT:  Well, so I get that.  Is the guide

9    bar a physical thing shaped like a pencil, or is it a space

10   into which you could fit a pencil?

11         MR. LYONS:  It is a space in which you can fit a

12   pencil, but it is formed into a solid object.  So it's not

13   just, you know, a space in the back panel there.  They could

14   go the entire way through.  It's kind of an indentation in

15   that back panel.

16         THE COURT:  Well, doesn't it kind of defy

17   ordinary usage to call a space a bar?  I mean, a bar, you

18   know, I'm thinking of, you know, since we're talking about

19   children here, like monkey bars.  You know, you hang on to

20   them.  There's nothing to hang on to if it's an indentation.

21         MR. LYONS:  Well, we think that, at least for

22   claim construction, what Wonderland argued for bar and the

23   reason they did this is because the EveryStage, the accused

24   product has a tube.  We called it a tube.  And so we asked

25   for additional limitations, you know, long, rigid, solid, so

1    it's not hollow.  And they wanted none of these limitations.

2             So it's a fairly broad interpretation of bar

3    based on Wonderland's arguments at claim construction.  And

4    we think that this meets -- this is, you know --

5             THE COURT:  "This" being the indentation?

6             MR. LYONS:  The cavity of the channel in the

7    SafeGuard.  You know, nothing in the claims requires that a

8    bar be fully enclosed.  I know Mr. Songer said, you know,

9    enclosed.  It's not enclosed.

10            That it be separate.  Nothing requires that this

11   bar be separate.  And that's all our expert said, it's not a

12   separate bar.  Never pressed for anything else.  But our

13   expert still said this is a bar under -- you know, in the

14   context of the claims and the patents.

15            THE COURT:  And then how is that so?

16            MR. LYONS:  Because it's a bar, but it's kind

17   of -- it's formed into something.  So the bar is formed via,

18   you know, cutting out the part of that back panel.  The bar

19   is that area there.  You know, it's that whole structure

20   combined.  You see the bar that's there.  There's things

21   that are in there.  Just like in the EveryStage, it's

22   hollow.  They have these pins that are, you know, spring

23   biased, and they go out.  And that's what locks the head

24   rest in.

25            THE COURT:  But in the end, the thing that

1  you're talking about as the lock bar or the guide bar is not

2  a physical thing.  It's a space in air.

3         MR. LYONS:  Well, I think what it is, and our

4  expert when he said it's a bar, it also includes the area

5  that's part of that back rest.  So you can't say that the

6  back rest and the bar are completely separate.  The bar is,

7  you know, the bounds of that cavity.  When you carve out

8  that cavity from the back rest, that's the bar.  It includes

9  part of the back rest.

10        And it functions exactly the same way as in the

11 EveryStage.  The only difference being in the EveryStage,

12 it's a tube that is separable and fully enclosed.  Here,

13 it's not fully enclosed.  It's not separable.  But those are

14 not limitations that we think are required by the claims.

15        THE COURT:  So when your expert said that his,

16 for lack of a better word, true belief is that your

17 EveryStage doesn't infringe and the prior art doesn't

18 anticipate, what was he pointing to that is missing from

19 your product and the prior art?

20        MR. MUELLER:  Your Honor, this is Mr. Mueller.

21 What he's pointing to there is the fact that the -- what

22 they call the guide bar in the EveryStage doesn't have a

23 purpose to guide the belts.  That any -- and so his reason

24 for believing that what they call the movable guide bar and

25 the lock bar in the EveryStage is not in either the

1    EveryStage or the SafeGuard is because that bar has one

2    purpose, and that purpose is to -- tube, you could call it,

3    is to house the plungers that control the movement of the

4    head rest up and down.

5            Whereas, in the milestone as well as the patent,

6    the movable guide bar actually does direct the harness belts

7    and moves the belts up and down.  In both the EveryStage and

8    the SafeGuard, the thing that moves the harness belts up and

9    down are the openings and the back rest.  And it's very easy

10   to see when you look at the EveryStage, things like that.

11           So his reason for saying that the limitation

12   isn't met is not because of the distinction between what a

13   bar versus a tube or anything like that.  It's because that

14   piece doesn't operate in the way and does not do what the

15   claims require it to do.

16           THE COURT:  All right.  Anything further from

17   you on that, Mr. Lyons?

18           MR. LYONS:  Your Honor, I just want to point to

19   the fact that that statement from our expert saying he

20   doesn't believe that the SafeGuard anticipates the patents,

21   that is just based on this 01 Communique case where the

22   Court said that defendant's infringement defense was firmly

23   routed in a limitation-by-limitation comparison between the

24   asserted claims and the accused product, but defendant also

25   presented an alternative invalidity defense that focused on

1    its prior art products.  And under the trial court's claim

2    construction, claims 24 and 45 were valid, but not

3    infringed.  But that if plaintiffs attempted to expand the

4    scope of the claims to include systems that were found in

5    the accused product, then the claims would be invalid in

6    light of the prior art.

7              So if you divorce infringement from this case

8    completely, and you asked our expert:  Does the SafeGuard

9    anticipate, he would say no.  The claim examiner would say

10   no.  But because of Wonderland's positions on certain things

11   such as this bar or the term above the control rack or above

12   the openings in the seat back, then he's saying, Well, you

13   know, if the EveryStage infringes, well then the SafeGuard

14   is the same, and it must anticipate.

15             So I think, you know, that comment was saying --

16   Wonderland is saying, Well, their expert admitted it doesn't

17   anticipate.  That's the end of it.

18             I don't think that's the end of it.  I think

19   he's saying under what I believe is the correct

20   interpretation, you are correct.  It doesn't anticipate.

21   But here's where you are interpreting these claims broadly,

22   and so it brings this in as an anticipatory reference.

23             THE COURT:  Okay.  Anything further?

24             Mr. Songer, do you have anything more to say

25   about this?

1           MR. SONGER:  Yes, three brief points, Your

2    Honor, and I'll just point you to the reference.  What was

3    just said, of course, is this practicing the prior art issue

4    that we've briefed at length.  I'll note that the law

5    clearly says that for anticipation, even with this

6    practicing the prior art mantra out there, the cases are

7    very clear.  You compare the claim to the prior art.  And we

8    just heard that if you ask the expert that, he would say,

9    no, they don't anticipate.

10          Second is on that channel, I think I heard that

11   their expert was saying it's part of the back rest or it's

12   part of that piece.  That was never testified to.  The bar

13   channel was always focused there, not as part of the head

14   rest.

15          And then the third, Your Honor, just -- and I

16   won't reargue the point, but on Nakagawa, that reference

17   with the actual car seat that folds out, on Exhibit 8 and I

18   believe it's paragraph 84, Mr. Campbell detailed what he

19   believed to be the rigid shell.  And it was the -- let me

20   get this straight here.  It was the cushion board of

21   Nakagawa.

22          So it's right there where he has it, and there

23   it is right up on the screen.  So it's Exhibit 8 to the

24   papers.

25          THE COURT:  And the cushion board is the shell

1    or the thing that you've identified as the -- oh, the

2    cushion board because that's what the material that the

3    child would actually sit against comes up flush against.  Is

4    that what the cushion board is?

5                MR. SONGER:  Yeah, that's -- it's what -- I

6    think it's element 122 in that patent.  It says where it is,

7    but it's not what they are now arguing is the shell and how

8    it's formed in with that cover plate on it.

9                So --

10                THE COURT:  Okay.

11                MR. SONGER:  And for that one, I'll just leave

12    those points there, Your Honor, for issue number one on your

13    order.

14                THE COURT:  All right.

15                MR. MUELLER:  Your Honor, I'm sorry.

16                THE COURT:  So let's go on to whatever is next.

17    Whatever is next, Mr. Songer?

18                MR. SONGER:  That is issue number two, Your

19    Honor.  That is also my argument and that relates to the

20    partial Daubert motion that we have on defendant's damages

21    expert --

22                THE COURT:  Okay.

23                MR. SONGER:  -- and what they're relying on.

24    And this one, I think, it's briefed fairly well, and it's

25    relying on the W.L. Gore decision from the Court.  But the

```
1    notion is rather simple.  It's although, of course, experts

2    can rely on other experts for their testimony, that first

3    expert has to have a basis and a reasonable basis for their

4    opinion, and it has to be disclosed and out there so it's

5    tested.

6              THE COURT:  Well, so Mr. Songer, I mean your

7    position, as I got it from the briefing, is essentially that

8    the defense expert, the opinions that the damages expert is

9    relying on of his or her analysis are things that he

10   basically told her in some kind of conversation.  These are

11   not things that are written down in his expert report; is

12   that right?

13             MR. SONGER:  That's correct for one of them, the

14   non-infringing alternatives.  For the second one on the use

15   of marketing and licensing, it's because the -- it's that

16   plus the addition that the technical expert on which the

17   damages expert relies has admitted that he has no marketing

18   or licensing expertise.  So --

19             THE COURT:  So, but the licensing and marketing

20   opinions of the technical expert, they are disclosed in his

21   reports?

22             MR. SONGER:  No, they're not disclosed, Your

23   Honor.

24             THE COURT:  Oh, okay.  So basically I was just

25   trying to get it down is so for non-infringing alternatives,
```

1    opinions not disclosed, but things that he would be

2    qualified to have opinions about for licensing and

3    marketing, not disclosed.  And he's not qualified.  That's

4    what you're saying?

5            MR. SONGER:  I think that's a fair

6    characterization, Your Honor.

7            THE COURT:  Okay.  And so you have deposed -- is

8    his name Campbell?

9            MR. SONGER:  Correct.

10            THE COURT:  You've deposed Mr. Campbell.  During

11    the deposition, did you ask him about his opinions on

12    non-infringing alternatives?

13            MR. SONGER:  I do not believe so.  I know he was

14    asked -- I'm looking for the right paper, Your Honor.  I

15    know he was asked about his marketing and licensing

16    experience.

17            THE COURT:  Yeah, yeah.  Well, so that's part

18    two.

19            MR. SONGER:  Right.

20            MR. YOCHES:  Your Honor, I can answer your

21    question since I took his deposition.

22            THE COURT:  Yes.

23            MR. YOCHES:  He was asked whether or not he was

24    aware of any non-infringing alternative being considered or

25    designed, and he said no.  And he had no specific

1    information about the attempt to have any non-infringing

2    alternatives, so there wasn't a whole lot to go from there.

3                THE COURT:  All right.  And so I think -- thank

4    you, Mr. Yoches.

5                And in terms of licensing and marketing, I have

6    not looked at Mr. Campbell's resume, but the response of the

7    defendants was something like he's had 30 years of

8    management experience at a high level in the car seats

9    field.  That may not be a hundred percent exactly what they

10   said, but that was the gist of it, I think.

11               Do you agree that's the gist of their response?

12   And what do you have to say about that?

13               MR. SONGER:  I believe that is the gist.  I

14   agree with that, Your Honor. And what I say to that is that

15   doesn't tie into the specifics of, for example, patent

16   licensing and the general marketing that would be relevant

17   under the Georgia-Pacific factors that the damage expert

18   would rely on.  Because remember what the damage expert is

19   looking for is to say, well, let's line up the comparable

20   licenses.

21               If Mr. Campbell -- his general experience may

22   not be in the licensing arm.  I don't know the composition

23   of their company, but you know, companies have people who

24   are specifically in charge of that.

25               THE COURT:  Is there something either at the

1    deposition, which I guess Mr. Yoches is the expert on, or in

2    the resume of Mr. Campbell, in either of those places, is

3    there any information about his patent licensing experience?

4              MR. SONGER:  No, Your Honor.  And I think we

5    cited in our brief the testimony that was done on the

6    deposition where he said he doesn't have any.

7              THE COURT:  Yeah.  I think was it he doesn't

8    have any or he's not an expert?

9              MR. SONGER:  Right.  I believe it was he's not

10    an expert, but again, there was nothing that indicated he

11    had any.

12              THE COURT:  Okay.  All right.  I sort of get

13    your positions there.  Why don't I hear from the other side.

14              MR. MUELLER:  This is Mr. Mueller, Your Honor,

15    and I'm going to take these issues.  The first, I think just

16    looking specifically at what they call marketing or

17    licensing issues, if you actually get down to what he talked

18    about, they are hardly the type of marketing and licensing

19    expert-type issues.  They are certainly the types of

20    things --

21              THE COURT:  Well, so first off, before we get to

22    that, Mr. Mueller, where would I find what he talked about?

23              MR. MUELLER:  In his -- in his -- any of his

24    reports, you mean, sir?

25              THE COURT:  Well, in the record.

1          MR. MUELLER:  Oh, in the record?  Well, it would

2     be as to conversations about discussions that Ms. Bennis

3     referred to and any deposition testimony that Mr. Yoches

4     might have elicited by asking him specific questions about

5     that elicited about those discussions.

6          THE COURT:  Well, so I get, because that's the

7     reason why we're having this dispute, that Ms. Bennis talked

8     to him and got something from him.  And I take it from your

9     answer that I won't find any of these in his actual expert

10    reports.

11         Was there any discussion of this at his

12    deposition?

13         MR. MUELLER:  So first and second in his expert

14    report as to the non-infringing alternatives --

15         THE COURT:  No, no, no.  We're talking about

16    marketing and licensing right now.

17         MR. MUELLER:  No.  Sorry.  No, I don't believe

18    there was anything asked specifically by Mr. Yoches as to --

19    I think he asked about non-infringing alternatives that

20    Evenflo considered at the time.  I don't believe he asked

21    him about his --

22         THE COURT:  Okay.  So hold your fire on

23    non-infringing alternatives, please.

24         MR. MUELLER:  Mm-hmm.

25         THE COURT:  Other than he's been in this field

1    for 30 years, what is there that would show that he has some

2    qualifications to be talking about patent licensing?

3              MR. MUELLER:   I don't think there's anything

4    more for him than there is for Mr. Myers.   Just that if

5    we're going to exclude Mr. Campbell's testimony or

6    Ms. Bennis' reliance upon for those kinds of things, then

7    we're going have to exclude Mr. Schoettelkotte's opinions on

8    the exact same issues.

9              THE COURT:   Well, that's a different thing,

10   which as far as I recall has not really been briefed or

11   argued.

12             MR. MUELLER:   I mean, I agree, Your Honor, but

13   from the standpoint of an unclean hands argument, we had no

14   intention of trying to limit Mr. Schoettelkotte's dependence

15   on these discussions with Mr. Myers.   But being faced with

16   this situation where they are accusing us of doing something

17   untoward, I believe we can point to many instances.

18             THE COURT:   Well, you know, untoward may not be

19   exactly the right word, but they've raised an issue that's

20   kind of long been of interest to me which is, you know, you

21   have experts, technical experts write lengthy reports.

22   Sometimes they're, you know, a thousand pages long.   I

23   gather they're not so long in this case.

24             And you know, people file Daubert motions, and

25   they get cross-examined.   And you know, no human being could

1    actually read this expert report.  It's so dense.

2             And then there's some other things that they

3    have a ten-minute conversation with the damages expert, and

4    that just comes in like, nope, don't need any explanation.

5    Don't need to have it written down.  Don't really need

6    anything at all.

7             And I've kind of wondered:  How can that be?

8    And that seems to be what's happened here.  And perhaps it's

9    happened for the plaintiff's damage -- or yeah, the

10   plaintiff's damages expert, too, but we're dealing with

11   Ms. Bennis.  You know, essentially you've got

12   uncross-examinable stuff because it's not her expertise.

13            Yeah, sure, she could rely on -- I have no

14   problem with her relying on technical expertise from a

15   technical person, but I do have a problem with that

16   technical expertise being undisclosed.  I don't think her

17   putting it in a footnote makes it disclosed.

18            So what do you have to say about that other than

19   they're just as bad?

20            MR. MUELLER:  And Your Honor, I certainly agree

21   with you.  I do think in some cases she may have over

22   footnoted for what are actually factual or conclusion

23   statements that don't necessarily need a technical expert's

24   opinion like the idea maybe that the royalty rate for a

25   single feature out of 20 will be less than the royalty rate

1    out of an entire product and the design of that product.

2              Those don't seem to be even footnoteable.  That

3    she chose to footnote them, that is -- with discussions to a

4    technical expert is of interest.  But from a purely

5    evidentiary standpoint, I'm not sure there's any reason why

6    it's any different than her saying it herself.

7              THE COURT:  Well, no.  On that point,

8    theoretically at least, I agree with you.  I think the

9    plaintiff -- I remember seeing something where they quoted

10   her as saying, you know, she's a damages expert, like this

11   meant she had no -- it might -- or I guess what I'd say is,

12   in my experience, patent damages experts are people who have

13   backgrounds to talk about not things like what's a

14   non-infringing alternative, but they do usually have a lot

15   of experience with licensing and marketing and, you know, a

16   wide range of things because that is their -- you know,

17   that's not usually the realm of a technical expert.

18              All right.

19              MR. MUELLER:  I would only ask on that subject

20   if you do choose to exclude some of Ms. Bennis' --

21              THE COURT:  Well, before you get to that point,

22   Mr. Mueller, just remind me:  When is this trial scheduled?

23              MR. MUELLER:  February 1st, I believe is the

24   initially scheduled trial date.

25              THE COURT:  Well, when you say "initially

1    scheduled," is that the --

2                  MR. MUELLER:  Yes.

3                  THE COURT:  -- currently scheduled?

4                  MR. MUELLER:  Correct, Your Honor.  Yes.

5                  THE COURT:  All right.  So tell me just a little

6    bit about the non-infringing alternatives which you were

7    dying to tell me about a little while ago.

8                  MR. MUELLER:  Sure.  Just as the non-infringing

9    alternatives, there are the two.  With respect to the

10   harness storage cavity, Ms. Bennis actually cites to it's --

11   plaintiff claims that Ms. Bennis relied exclusively on

12   Mr. Campbell.  That's incorrect.  Ms. Bennis actually cites

13   specifically to  Mr. Davis and Mr. Dahle's testimony and

14   includes it as to the non-infringing alternatives to the

15   harness storage cavity.

16                  With respect to the non-infringing alternatives

17   as to the '117 and the '725, Mr. Campbell has testified over

18   and over and over again about his belief and understanding

19   that the SafeGuard is the structural equivalent or

20   structurally identical to the EveryStage.  And his argument

21   is that that's a non-infringing alternative because it has

22   to be.  It's prior art.  And thus, the EveryStage could

23   incorporate that structure.

24                  To the extent that --

25                  THE COURT:  So Mr. Mueller, I tend to -- I have

1    certainly an open mind.  That doesn't take a lot of

2    explanation to say that something that is undisputedly prior

3    art is, I would think, by definition non-infringing.  But in

4    terms of how -- so generally the way I understand a

5    non-infringing alternative is that at the hypothetical

6    negotiation, the defendant, Evenflo, could have said, Well,

7    we don't have to pay very much for this because we can make

8    money by selling something else than the infringing

9    alternative.

10                And if that's the right premise for this, what

11   is it that they would be selling or doing that would give

12   them, you know, income for doing something other than

13   selling the infringing Every Guard or whatever it's called?

14                MR. MUELLER:  SafeGuard.  They would incorporate

15   the structure that is allegedly infringing that's disclosed

16   in the SafeGuard into the design of the EveryStage car seat.

17                THE COURT:  So --

18                MR. MUELLER:  And, yes, I agree it's a circular

19   argument.

20                THE COURT:  What?

21                MR. MUELLER:  It's a circular argument.

22                THE COURT:  Well, I was going to say that's --

23   it doesn't seem very precise.  And maybe that's just a

24   factual question, but that's not very convincing to say they

25   could have done -- you know, what is it that they would have

1    done with the prior art SafeGuard seat that would --

2              MR. MUELLER:  And Your Honor is starting to

3    understand the catch 22 involved with the "practicing the

4    prior art defense" which is something I wanted to raise

5    really quick which is that the practicing the prior art

6    defense that plaintiffs accuse us of using is saying, Look,

7    here's the prior art.  We do the same thing.  It either

8    doesn't infringe or it is invalid.  It has to be one of the

9    two.

10             And I agree that that is an improper defense to

11   infringement and validity which is why you have to go the

12   alternative route which is what we went in 01 Communique,

13   and the Federal Circuit has been consistent about and said,

14   Look, we think we don't infringe based upon the way the

15   claims read.  But if we do, here's this prior art, and it

16   must invalidate.

17             And that's what we did.  And that's what the

18   Federal Circuit has consistently said is not practicing the

19   prior art.  And that's what we've been accused of being

20   contradictory on.

21             Of course, it bleeds into this question which is

22   the circular argument about:  How can the expert say that

23   they would do exactly what the SafeGuard teaches?  Exactly

24   what the SafeGuard teaches invalidates the patent, and

25   that's what -- the position we're in there.

1          THE COURT:  Well, so one non-infringing

2     alternative, I assume, is instead of selling the EveryStage,

3     you could just keep selling the SafeGuard; right?

4          MR. MUELLER:  We don't sell the SafeGuard, but

5     somebody could keep selling the SafeGuard.  But yes, that

6     was another company's product, but --

7          THE COURT:  Ah, okay.  So you can start

8     manufacturing the SafeGuard and selling it?

9          MR. MUELLER:  Presumably.

10          THE COURT:  Maybe you'd then infringe their

11     patent.  Okay.

12          MR. MUELLER:  Their patents are expired, but --

13          THE COURT:  Well, all right.  Okay.  Do you have

14     anything else that you want to say about this, Mr. Mueller?

15          MR. MUELLER:  As I was saying before, just if

16     there was some consideration to excluding Mr. Campbell's or

17     Ms. Bennis' reliance on Mr. Campbell for "marketing and

18     licensing issues".  And as I said, you should look at each

19     individual one to see whether or not it really is a

20     marketing or licensing expert issue, what he's really

21     talking about when she's citing to, just that we would be

22     given an opportunity in a motion in limine to exclude their

23     damage expert's reliance on the very same types of

24     information.

25          THE COURT:  Okay.  Well, I have a different

1    thought about that.  But anything else?

2              MR. MUELLER:  That's it.

3              THE COURT:  All right.  Mr. Songer, I guess, do

4    you have anything in reply?

5              MR. SONGER:  Very briefly, Your Honor.  I think,

6    and Your Honor situated it in the context of:  How is this

7    going to play out at trial?  I've got an expert.  Of course,

8    his report is not evidence.  He's going to stand up and

9    provide evidence in his disclosed opinions.  The technical

10   expert and then Ms. Bennis is going to come along and rely

11   on what was said there.  When they're not disclosed, of

12   course, and this is laid out in the Gore case, then we have

13   no opportunity, and there's no basis for having that later

14   expert rely on it.

15             The circular argument, as it were, it is

16   something that -- they are stuck with what the technical

17   expert believes.  I mean, he has said that if you assume, as

18   the damage expert must do for a non-infringing alternative,

19   she must assume that it's not infringing.  Right.  And then

20   you go in.

21             But all the testimony from Mr. Campbell that

22   she's relying on says it's equivalent to the EveryStage, and

23   it's infringing, and you get into this practicing the prior

24   art.  So while it's okay to say now that it's a circular

25   argument, how do we untangle that at trial with actual

1    testimony?  And I don't think -- and no supplementation will

2    fix it because that is his opinion as it is through there,

3    to the extent you were thinking of that.

4             And the same would go with the marketing and

5    licensing is if -- you know, again, it's he doesn't have

6    that expertise.  It's not there.  She can't rely on it.

7    All she has in her report is a reliance on what he said.

8    Now, there may be other things she was thinking of, but

9    that's not been disclosed to us.

10             THE COURT:  Did you depose Ms. Bennis?

11             MR. SONGER:  Mr. Yoches did.

12             THE COURT:  Okay.  Sorry.  When I say "you," I

13    mean your side, not you personally.

14             MR. SONGER:  No.  Yes.  Yes.  Yes, we did, Your

15    Honor.

16             THE COURT:  Okay.  All right.  So here's what

17    I'm thinking is as far as Ms. Bennis and Mr. Campbell go,

18    and I would basically apply this to the plaintiff's damages

19    expert.  If, in fact, it's the case there, which I don't

20    have any information one way or the other, if the damages

21    expert is going to rely on something that the plaintiffs --

22    the technical expert opines about, it needs to be written

23    down in a report.  And what I would propose is that each

24    side have a period of time which is, given where we are not

25    a great period of time, to supplement their technical expert

1    reports to cover anything that the damages expert is relying

2    upon that's not written down in the technical expert's

3    report.

4         And also, if the damages expert is not actually

5    relying on something that the technical expert said, but

6    just added a footnote because that's what experts do, that

7    they can add an addendum to their report saying, you know,

8    essentially for these "X" places where I have footnoted the

9    technical expert, I have a sufficient basis in my own

10   experience to reach the same opinion without relying on what

11   the person said.

12        And I'm thinking that you could do this in, you

13   know, a relatively short period of time.  You know, maybe by

14   the middle of next week, Wednesday, probably November the --

15   well, November the 11th.  And if there's a problem with what

16   the experts say, particularly if there's a problem that when

17   you're doing your motions in limine, if there seems to be an

18   insufficient basis for opinions or something else, you can

19   raise them in the motions in limine.

20        And just to be clear, I'm not saying the

21   plaintiff necessarily has to do anything because I don't

22   know what your experts have done, but I'm just saying I

23   would, down the road, treat both sides hopefully equally so

24   that if you have a problem along these lines, you should

25   take care of it.  So that's what I'm inclined to do.

1              Is there some issue with this that either one of

2    you want to raise?

3              MR. YOCHES:  Your Honor, it's Bob Yoches.

4              THE COURT:  Yes.

5              MR. YOCHES:  We made sure that all the opinions

6    that our damages expert relied upon that were from our

7    technical expert were in the technical expert's report

8    already.

9              THE COURT:  Well, so I'm saying I don't know

10   what you all did.  I'm saying if you have a problem, take

11   care of it.  If you don't have a problem, you don't need to

12   tell me now because I'm not going to rule on it.

13             MR. YOCHES:  Here's why I brought that up, so

14   Evenflo has had an opportunity to depose our expert on those

15   opinions.

16             THE COURT:  Uh-huh.

17             MR. YOCHES:  If you're giving them the

18   opportunity to supplement the -- Evenflo's technical expert

19   to supplement his report, it seems to me that there should

20   be an opportunity to depose him on his supplementation.

21             THE COURT:  All right.  Well, I'm going to take

22   that under advisement.  Why don't we see what it is exactly

23   that the defendant does on November 11th.  And you can talk

24   to each other afterwards, and if there's a big problem with

25   what the defendant has done, and they won't agree to a

1    deposition, you can come back to me, and I will rule on it.

2    But it's a little too abstract right now, and I'm not

3    convinced that it's all that big of a problem.  So let's do

4    this one step at a time.

5              Mr. Mueller, do you have anything to say?

6              MR. MUELLER:  No, Your Honor.

7              THE COURT:  Okay.  So we had two -- I think we

8    had two other things left.  One was this indefiniteness and

9    written description, and the other was the above issue.  I'm

10   not sure that I really want to argue a whole lot about the

11   written description and the indefiniteness other than to ask

12   the defendants:  What were you thinking raising this in a

13   rebuttal report?

14             MR. MUELLER:  Your Honor, I'm not sure what to

15   say to that, but other than the fact that I don't think --

16   well, we had no intention of bringing that issue up at

17   trial, so we raised it, obviously, in the claim construction

18   hearing.  You seemed unconvinced about it which is fine.  So

19   we are more than happy to table that issue for a later

20   appeal, if necessary, related to the claim construction

21   hearing.  So we're happy to forego Mr. Campbell's testimony

22   as to written description for any trial purposes.

23             THE COURT:  Okay.  So basically you're

24   withdrawing for trial and for later argument in front of me

25   the written description and the indefiniteness defenses.  To

1    the extent you've made a record, particularly on

2    indefiniteness, your rights to appeal that to the Federal

3    Circuit and argue about it are maintained.

4              That's what you would like?

5              MR. MUELLER:  That's exactly correct, Your

6    Honor.

7              THE COURT:  Okay.  I'm inclined to do that.  Is

8    there any objection by plaintiff?

9              MR. YOCHES:  No, Your Honor.

10             THE COURT:  Okay.  Well, that's resolved.

11             All right.  So why don't we talk about the above

12   limitation.  And I believe on this one, Mr. Mueller, you or

13   Mr. Lyons should go first.

14             MR. MUELLER:  And that will be Mr. Lyons.

15             THE COURT:  Okay.

16             MR. LYONS:  Your Honor, Jeff Lyons here.  So for

17   above, we argued at claim construction for this completely

18   above completely below.  We're not trying to rehash that

19   argument here.  All we're arguing now is that under a plain

20   ordinary interpretation of the term above, some part of that

21   first structure must be above that second structure. It

22   can't be in line --

23             THE COURT:  And I think I understand your

24   position.  At some place in the briefing, you had some

25   scenarios.  And you know, if you can all see me, I have a

1    yellow marker and a blue pen.  And in my claim construction

2    what I meant to say is that one could say that in this that

3    the blue pen is above the yellow marker.  I didn't mean to

4    say that if the blue pen is somewhere in the middle of the

5    yellow marker that any normal construction of the English

6    language would allow you to say the blue pen is above the

7    yellow marker.

8              I take it that's your position, Mr. Lyons;

9    right?

10             MR. LYONS:  That's exactly it.  Yes.

11             THE COURT:  Okay.  And so let me hold the

12   thought, but I take it the plaintiff's position is that

13   because of my talk about complete aboveness or above

14   completely, that you can argue that the blue pen here is

15   above the yellow marker.

16             Is that your position, plaintiff?

17             MR. YOCHES:  Let me get my video on.  No, Your

18   Honor.  I think the confusion is -- the question is:  What

19   has to be above the other thing?  In other words, I don't

20   think the issue is what above means.  I think the issue is

21   what are you comparing to see what's above?

22             THE COURT:  Okay.

23             MR. YOCHES:  I can address that.

24             THE COURT:  Why don't you address that.

25             MR. YOCHES:  I think if Your Honor doesn't mind

1    to go to our Exhibit 1 which is the patent.

2              THE COURT:  Okay.  I don't have it easily in

3    front of me, but go ahead.

4              MR. YOCHES:  Well, what the patent explains is

5    that you've got a fixed guide bar or you've got a fixed --

6    I'm sorry, a fixed bar.  And the reason this whole thing

7    works is because the harness belts loop over the fixed bar.

8    And why don't we go to Figure 18, if we can.  All right.  So

9    the belt is 50.

10             THE COURT:  Yeah.

11             MR. YOCHES:  And it comes in kind of a serpent.

12   You can see at the bottom or in the middle -- at the bottom

13   is 50.

14             THE COURT:  Right.  And runs practically from

15   the top to the bottom.

16             MR. YOCHES:  Right.  And then it loops

17   underneath, and it runs up the back.  You can see 50 again.

18             THE COURT:  Oh, yes, so I can.

19             MR. YOCHES:  And it goes over this.  49 is the

20   fixed bar at the top.

21             THE COURT:  Yes, I see it.

22             MR. YOCHES:  And then it comes down, and it kind

23   of goes around.  It's 46 which is that movable guide bar.

24             THE COURT:  Okay.

25             MR. YOCHES:  And back out and down.

```
 1                    THE COURT:  Yeah.
 2                    MR. YOCHES:  Okay.  And so the question is:  The
 3      fixed guide bar has to be above these openings.  That's what
 4      the claim says.
 5                    THE COURT:  Above these openings.  Which
 6      openings?
 7                    MR. YOCHES:  Which, unfortunately, aren't shown
 8      here.  They're shown on Figure 16, I guess.
 9                    THE COURT:  Figure 16.  This is like this series
10      of eight different openings kind of --
11                    MR. YOCHES:  The one big opening that covers --
12      it's a big area.  But the purpose of the opening, if you go
13      back to Figure 18, is there's an opening in the seat back
14      for the harness belts to go through.  So the claim says --
15      do we have the claim on the slides here?  Well, never mind.
16                    The claim says that the openings are where the
17      harness belts pass through.  You're going to have to blow
18      that up, if you can.  Okay.  So it says the harness belts
19      extend through the openings.  So the openings that we're
20      talking about that the fixed guide bar has to be above is
21      where the belts are passing through.  And if you look at the
22      patent, if we can go to column 6, line 57 where this is
23      discussed, in line 57, it says the guide members 46 are
24      aligned with the generally vertical openings which we're
25      talking about forming the seat back.  So the harness belts
```

1    can move vertically with the head rest without impediment

2    from the seat back.  So what we're talking about is there

3    are openings in the seat back, so the harness belts can move

4    vertically with respect to it without impediments.

5            So now if we go to slide 31, we can see what

6    we're talking about for infringement.  So we've got the

7    fixed guide bar.  And this is in the EveryStage, so this is

8    the accused product.  And the yellow dots, the yellow

9    squares are kind of the opening.  But the only part of the

10   opening where the harness belts are passing through and

11   don't need to be -- there needs to be an assurance of

12   there's no impediment there is exactly what you see there

13   where the black crosses the yellow.

14           And though our argument is for infringement, the

15   fixed guide bar is, indeed, above the opening in the claim

16   which is where the harness belts are passing through.  And

17   if for whatever reason they wanted to -- they wanted to make

18   the opening bigger, it serves really no purpose here for the

19   harness belts.  But it may go up, and it's about the same

20   height of it.

21           But that's not the opening that we're talking

22   about for infringement.  The opening we're talking about for

23   infringement is where the harness belts are passing through.

24           THE COURT:  Mr. Yoches.

25           MR. YOCHES:  Yes.

1             THE COURT:  You know, perhaps I -- well, so in

2    this drawing here which comes from the Myers' reply report

3    at paragraph 30, are each of the little yellow blocks

4    supposed to represent a different opening or --

5             MR. YOCHES:  No.

6             THE COURT:  -- is it the case that the yellow

7    blocks from top to bottom just are one opening?

8             MR. YOCHES:  There -- it's one.  They're not

9    separate.  They're one thing.

10             THE COURT:  Okay.  And so you've got an opening.

11    And so what you're construing the claim as being is that the

12    fixed guide bar has to be above the opening where the

13    harness belt passed through meaning a particular spot as

14    opposed to however big the opening actually is?

15             MR. YOCHES:  Right.  And to be more clear,

16    wherever the harness belt passes through.  In other words,

17    if, indeed, it passed through different places, that would

18    also be part of the opening.  But we don't believe it ever

19    passes through this very top part here on the right which is

20    what they're saying is above the fixed bar.

21             THE COURT:  Okay.

22             MR. YOCHES:  Their expert says it does.  Our

23    expert says it doesn't.  So --

24             THE COURT:  But you know, and I don't have the

25    claim language right in front of me, and I'm not suggesting

1    that you put it in front of me, but essentially the

2    construction that you want or sort of the scope of the claim

3    is that the fixed guide bar is above where the harness belt

4    passes through the opening.

5              MR. YOCHES:  Right.  It's the part of the

6    opening -- it's the -- the opening that's referred to is

7    where the harness belts are passing through.

8              THE COURT:  Okay.

9              MR. YOCHES:  Not --

10              THE COURT:  And so in terms of above, I think I

11    understand your position is in the context of this claim,

12    above is related to a particular point, not to the opening

13    from top to bottom.

14              MR. YOCHES:  Correct.

15              THE COURT:  All right.

16              MR. YOCHES:  And the patent law concept is that

17    if there's -- if you add stuff like add parts of the

18    opening, what they have there, that doesn't avoid

19    infringement.

20              THE COURT:  Okay.  I think I vaguely have heard

21    something like what you just said.

22              All right.  So what does the other side have to

23    say about this?  I guess not Mr. Songer, but somebody else.

24              MR. YOCHES:  Mr. Lyons, I think.

25              MR. LYONS:  Yeah, Your Honor.  Jeff Lyons here.

1    The opening is only relevant to where the harness belt

2    passes through, but that's not what the claim says.  Claim

3    9, at least in the '117, says that it requires said seat

4    back being formed with a pair of laterally spaced openings.

5    And then later, a fixed guide bar mounted in said seat back

6    above said openings.

7            I mean, he just admitted here that the yellow

8    dotted line is the opening.  And the fixed guide bar is not

9    above that opening.  I don't see anything in the claims that

10   require, you know, limits to where the harnesses pass

11   through an opening or anything like that.  It just has to be

12   above.

13           And I think that is also demonstrated -- let's

14   see, with -- we have the same argument for the '725, and

15   it's the fixed guide bar above the control rack.  Well, what

16   they're arguing here, it's above the relevant portion of the

17   control rack, but it's still not above 30 percent of that

18   control rack.  So under any normal definition of above, it's

19   not above it.  Maybe they have some doctrine of equivalents

20   arguments or something, but I don't think the claims warrant

21   their limitation of what above is.  I think this is very

22   clearly not above the control rack which they've identified

23   as those dotted space openings there.

24           THE COURT:  So in the '725 patent or what you're

25   showing me in the Myers' opening report at page 100 is the

 1    control rack, in the view of you, the defendant, basically

 2    covers not only the area that's enclosed in the dotted line,

 3    but also the area that's enclosed in the red.  And what

 4    you're saying is the context of the claim is the fixed guide

 5    bar is mounted above the control rack, and the control rack

 6    is this whole thing, so therefore, it can't be above.

 7              That's your argument; right?

 8              MR. LYONS:  Your Honor, that's correct.  The

 9    part in the red is still part of the structure enclosed in

10    the dotted lines.  It's one solid piece.

11              THE COURT:  And Myers is the expert for the

12    plaintiff or the defendant?

13              MR. LYONS:  For the plaintiff.

14              THE COURT:  Okay.  Can I just go back to

15    Mr. Yoches, and just keep this screen or this slide deck on.

16              Mr. Yoches, what do you have to say about this?

17              MR. YOCHES:  So for this one, it's something

18    similar.  This is the other patent.  But what their own

19    30(b)(6) witness said is these top three positions that are

20    in the red box, those are only used, not when you're in the

21    car seat mode, but when you're in the booster mode.  And

22    when you're in the booster mode, you don't have a harness

23    belt.  You've stored them.

24              So I mean, there's a control rack there, but it

25    has nothing to do with the patent of keeping the harness

```
1   belts at the same length as you move up and down those --
2   the fixed guide bar has to be above the control rack in
3   order to maintain this feature of keeping the harness
4   belts -- you know, without having to readjust them as you
5   move the head rest up and down.  And that although there are
6   these three parts, these three spaces up here, those are not
7   being used when there's a harness belt.
8             THE COURT:  But in terms of them being part of
9   the control rack, you agree they are part of the control
10  rack?
11            MR. YOCHES:  No, I think the control rack for
12  purposes of the '725 patent is just the bottom parts because
13  those are the only parts that are being used with a harness
14  belt.
15            THE COURT:  Well, what are the three parts that
16  are above if they're not part of the control rack?
17            MR. YOCHES:  Well, when you're in the booster
18  mode, when you don't have harness belts, they're just head
19  rests.
20            THE COURT:  So they're part of the control rack
21  some of the time, but not part of the control rack others of
22  the time?
23            MR. YOCHES:  Right.  I don't think they're --
24  the argument would be they're not part of the control rack
25  when you're using harness belts.
```

```
 1              THE COURT:  That seems to be a pretty flexible

 2   construction of control rack, don't you think?

 3              MR. YOCHES:  Well, I think it's relevant to the

 4   patent.  The patent is talking about what is it that you

 5   need in order to have a situation where you can adjust the

 6   head rest up and down and keep the harness belts the same

 7   length without having to adjust them.  And the fact that

 8   they added three positions on when they're not using the

 9   harness belts doesn't seem to me -- it may be part of a

10   control rack for a booster mode, but it's not part of the

11   control rack for the car seat.  It's not usually a car seat.

12              THE COURT:  It seems to me that you're -- do you

13   agree that if I said you can't really argue that the top

14   three positions are not part of the control rack that the

15   fixed guide bar is not above the control rack?

16              MR.  YOCHES:  Yes.

17              THE COURT:  All right.  Thank you.  The argument

18   you were making, which I think was in the '117 patent, are

19   the two arguments independent between the '117 and the

20   openings and the '725 and the control rack so that I could

21   disagree with you on the control rack, but still say it's a

22   factual question on the openings?

23              MR. YOCHES:  Yes, Your Honor.  They're two

24   independent issues.

25              THE COURT:  All right.  Let me go back to, I
```

1    think, Mr. Lyons.  What do you have to say about the '117,

2    Mr. Lyons?

3                MR. LYONS:  Again, there, Your Honor, if you

4    look at the language in the claims, it just says it requires

5    openings and requires the fixed guide bar above the

6    openings.  And they've said the dotted line, they've agreed

7    that that is the opening.

8                Now they're just trying to limit it to where,

9    you know, the harness belts cross through that opening as

10   being a relevant part of the opening, and I don't think you

11   can limit it that way.  I think the claims say you need

12   these opening and the fix guide bar has to be above it.  So

13   just like in the '725, the bar is not above the top of the

14   opening, so it's not above.  I think it's still the same.

15               THE COURT:  So if I agreed with you, Mr. Lyons,

16   on one or both of these patents, would the net result be

17   that I would rule that every asserted claim of those two

18   patents is not literally infringed?

19               MR. LYONS:  That's correct for the '117.  I

20   believe that's correct for the '725.

21               MR. YOCHES:  Your Honor, on the '725, two of the

22   claims, I believe claims 1 and 2, do not have the control

23   rack issue.

24               MR. LYONS:  All right.

25               THE COURT:  Okay.  And in any event, from what I

1    could gather from the briefing, none of this actually gets

2    rid of anything in terms of the number of asserted claims

3    because it seems like every single limitation, plaintiff has

4    a doctrine of equivalents argument that, at least on summary

5    judgment, is not challenged; is that right?

6              MR. LYONS:  Your Honor, for defendants, yeah, we

7    did not challenge any of the doctrine of equivalents on

8    summary judgment.  I believe they have arguments for all of

9    them.

10             THE COURT:  Okay.  All right.  Is there anything

11   more?  So counsel for both sides, starting with the

12   plaintiff, do you agree that, in fact, I don't need to

13   construe above any further because the argument here really

14   is not about what the meaning of above is, the argument is

15   something different than that?

16             MR. YOCHES:  Yes, Your Honor.

17             MR. LYONS:  I think that's right, Your Honor.

18             THE COURT:  Okay.  All right.  Is there anything

19   else in terms of the pending motions that I haven't

20   addressed that you want to address, starting with the

21   plaintiff?

22             MR. YOCHES:  I don't think so.

23             THE COURT:  Mr. Songer?

24             MR. SONGER:  No.  No, Your Honor.

25             THE COURT:  Okay.  And for the defendant?

1          MR. MUELLER:  No, Your Honor.  I think we hit

2     everything.

3          THE COURT:  Okay.  So probably in the not too

4     distant future, I'd be asking you this anyhow, so I'm just

5     curious:  Are all the witnesses who you all are expecting to

6     testify live people who are residents in the United States?

7          MR. MUELLER:  Yes, for Evenflo, Your Honor.

8          MR. YOCHES:  I think, Your Honor, for the

9     plaintiffs, we have maybe one who is in Taiwan.

10          THE COURT:  All right.  If the person in Taiwan

11     wanted to be here for this trial in person, is that

12     something they could do today?

13          MR. YOCHES:  Today?

14          THE COURT:  Well, I mean now.

15          MR. YOCHES:  No, but I meant the answer to the

16     question is I don't know what the rules are about being able

17     to fly in the United States.  I mean --

18          THE COURT:  Well, I think it's pretty limited,

19     but is the person in Taiwan important?

20          MR. YOCHES:  Yes.  But critical, maybe not.

21          THE COURT:  Okay.  All right.  So could I ask

22     that sometime before December 1st, you all separately and

23     together figure out who the live witnesses are that you

24     would actually want to have testify live at a trial.  Figure

25     out whether they're all of their own free willing to come to

1    Delaware for the trial.  I guess also the lawyers.  And

2    basically figure out what your views are in terms of whether

3    conditions seem like they would be appropriate for a trial,

4    a jury trial and how important it is to you all -- and of

5    course, the sides can have different points of view on

6    this -- to have live witness testimony as opposed to remote

7    live witness testimony.  And I guess I'd say before

8    December 1st because I think it's useful to talk about these

9    things before you start gearing up for the pretrial order.

10                So I don't really know exactly what the date is

11   that makes the most sense, but do you basically understand

12   what I'm asking?

13                MR. SONGER:  Yes, Your Honor.

14                MR. MUELLER:  Yes, Your Honor.

15                THE COURT:  Okay.  All right.  Well, listen, the

16   argument has been helpful this morning.  I appreciate the

17   preparation that has gone into it.  You know, by my count,

18   really the two things that I'm going to have to figure out

19   are the plaintiff's requests or motions for declaring

20   certain references to be non-anticipatory, and I think the

21   question of whether there's no literal infringement of all

22   of the asserted claims of the '117 and all, but claims 1 and

23   2 of the '725 based on the guide bar or whatever it's called

24   in the particular claims being above the openings or the

25   control rack.

1            And so I will attempt to work on those.  But it

2    seems to me that in the end, the resolution of neither of

3    those issues is likely to have any significant impact on --

4    well, at least the second issue, it's not going to have any

5    significant impact on what the dispute is at trial.  I

6    suppose if I cleared out a few non-anticipatory references,

7    that would at least reduce the scope.

8            There was one other thing.  Somewhere there was

9    a footnote or something else that peaked my curiosity which

10   was that plaintiff, I believe, said that there was some

11   invalidity defense that defendant had that wasn't covered by

12   these summary judgment motions.

13           What's the nature of that defense?

14           MR. YOCHES:  Your Honor, for the '294 patent,

15   there's an obviousness defense.

16           THE COURT:  Okay.  But that doesn't apply to the

17   '117 and the '725?

18           MR. YOCHES:  No.

19           THE COURT:  Okay.

20           MR. YOCHES:  It's only anticipation.

21           THE COURT:  So if I were to rule in the

22   plaintiff's favor on the various non-anticipation arguments,

23   there would be no trial defense of invalidity as to the '117

24   and the '7 --

25           MR. YOCHES:  25.

1          THE COURT:  -- 25 patents?

2          MR. YOCHES:  Yes, Your Honor.

3          MR. MUELLER:  Your Honor, I don't believe that's

4     true.  Your Honor, I believe that our experts opined as to

5     both the invalidity and the non-obviousness of those

6     patents.

7          THE COURT:  Okay.  Well, I guess --

8          MR. YOCHES:  I disagree.

9          THE COURT:  -- either you did or you didn't.

10    Okay.  But all right.  Well, listen, there's nothing else.

11    Thank you very much.  Have a good day, and we'll have

12    further contact.  Okay?

13          (Everyone said, Thank you, Your Honor.)

14          THE COURT:  Bye-bye.

15          (Oral argument was concluded at 11:59 a.m.)

16          I hereby certify the foregoing is a true and

17    accurate transcript from my stenographic notes in the

18    proceeding.

19               /s/ Heather M. Triozzi
                 Certified Merit and Real-Time Reporter
20               U.S. District Court

21

22

23

24

25