IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WONDERLAND SWITZERLAND AG | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 18-1990 (RGA) |
| | ) | |
| EVENFLO COMPANY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## EVENFLO'S POST TRIAL BRIEF IN RESPONSE TO WONDERLAND'S BRIEF ON INFRINGEMENT AND DAMAGES OF US PATENT NOS. 7,862,117, 8,087,725 AND 8,123,294

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
Sarah E. Simonetti (#6698)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com
ssimonetti@morrisnichols.com

*Attorneys for Defendant*

OF COUNSEL:

John M. Mueller
BAKER & HOSTETLER LLP
312 Walnut Street, Suite 3200
Cincinnati, OH  45202-4074
(513) 929-3400

Jeffrey J. Lyons
BAKER & HOSTETLER LLP
1201 North Market Street, 14th Floor
Wilmington, DE  19801
(302) 468-7088

April 21, 2021

**<u>TABLE OF CONTENTS</u>**

**Page**

I. INTRODUCTION ...................................................................................................1

II. LEGAL STANDARDS ...........................................................................................1

    A. Noninfringement ...........................................................................................1

    B. Doctrine of Equivalents ................................................................................1

    C. Damages.........................................................................................................2

III. NON-INFRINGEMENT...........................................................................................3

    A. The EveryStage Does Not Infringe the Asserted Claims of the '294 Patent. ..........3

        1. The EveryStage Does Not Have a Harness Storage Cavity Sized to Receive the Harnesses.................................................................3

        2. The EveryStage Does Not Have a Cover Forming a Smooth Support Over a Harness Storage Cavity. ...........................................7

        3. The EveryStage Does Not Have Slots Formed in the Harness Storage Cavity.............................................................................9

        4. Wonderland Has Failed to Prove Infringement of any Claim of the '294 Patent Under the Doctrine of Equivalents. ........................11

        5. Wonderland Failed to Present Evidence for All Elements of Its Induced Infringement Claims. ..................................................12

    A. The EveryStage Does Not Infringe Claim 1 of the '725 Patent ............................14

        1. The EveryStage Does Not Include a Control Rack located on a Rear Surface of a Seat Back. ................................................14

        2. The EveryStage Does Not Include a Lock Bar that can be Moved into Engagement with Engagement Portions on the Control Rack...................15

        3. The EveryStage Does Not Include Harness Belts Connected to a Lock Bar that Move Vertically. ..........................................17

    B. The EveryStage Does Not Infringe Claim 9 of the '117 Patent. ............................19

        1. The EveryStage Does not Have a Seat Back with a Pair of Laterally Spaced Openings Therethrough.................................................19

i

2.    The EveryStage Does not Have a Movable Guide Bar Positioned in Register with the Openings. ...................................................................20

3.    The EveryStage Does not Have a Movable Guide Bar that Directs Harness Belts through the Openings in the Seat Back..............................22

4.    The EveryStage Does Not Have a Fixed Guide Bar Mounted in the Seat Back Above the Openings.................................................................23

5.    Wonderland Has Failed to Prove Infringement of Claim 9 of the '117 Under the Doctrine of Equivalents ...........................................................26

A.    Wonderland's Expert Improperly Disregarded Two Comparable Licenses..........27

B.    The Remainder of Wonderland's Expert's Analysis was Speculative and Lacked Evidentiary Support. ...................................................................29

C.    Mr. Schoettelkotte's "Analytical Approach" Analysis Is Flawed and Unreliable.................................................................................................33

V.    MARKING ...........................................................................................................35

VI.    CONCLUSION……………………………………………………………………….37

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*01 Communique Lab., Inc. v. Citrix Sys., Inc.,*
    889 F.3d 735 (Fed. Cir. 2018)......................................................................................7, 10, 11

*Amgen Inc. v. Sandoz Inc.,*
    923 F.3d 1023 (Fed. Cir. 2019), *modified on reh'g*, 776 F. App'x 707 (Fed.
    Cir. 2019) ...........................................................................................................................12

*Amstar Corp. v. Envirotech Corp.,*
    730 F.2d 1476 (Fed. Cir. 1984)..........................................................................................24

*Arctic Cat Inc. v. Bombardier Recreational Prods.,*
    876 F.3d 1350 (Fed. Cir.2017)......................................................................................35, 36

*Carroll Touch, Inc. v. Electro Mech. Sys., Inc.,*
    15 F.3d 1573 (Fed. Cir. 1993)............................................................................................24

*Cole v. Kimberly–Clark Corp.,*
    102 F.3d 524 (Fed. Cir. 1996)............................................................................................17

*Deering Precision Instr. L.L.C. v. Vector Distr. Sys. Inc.,*
    347 F.3d. 1314, 68 U.S.P.Q.2d (BNA) 1716 (Fed. Cir. 2003) ...........................................2

*Endo Pharm. Inc. v. Actavis Inc.,*
    2017 WL 3731001 (D. Del. Aug. 30, 2017) .......................................................................15

*Ericsson, Inc. v. D-Link Sys., Inc.,*
    773 F.3d 1201 (Fed. Cir. 2014)..........................................................................................28

*Finjan, Inc. v. Secure Computing Corp.,*
    626 F.3d 1197 (Fed. Cir. 2010)..........................................................................................28

*Gart v. Logitech Inc.,*
    254 F.3d 1334 (Fed. Cir. 2001)..........................................................................................35

*Georgia-Pacific Corp. v. U.S. Plywood Corp.,*
    318 F. Supp. 1116 (S.D.N.Y. 1970)...............................................................................31, 32

*Haynes Int'l, Inc. v. Jessop Steel Co.,*
    8 F.3d 1573 (Fed. Cir. 1993)................................................................................................2

*Kahn v. Gen. Motors Corp.,*
    135 F.3d 1472 (Fed. Cir. 1998)............................................................................................1

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
 481 F.3d 1371 (Fed. Cir. 2007)..................................................................................................10

*Litton Sys., Inc. v. Honeywell, Inc.*,
 140 F.3d 1449 (Fed. Cir. 1998)..................................................................................................17

*Lucent Techs., Inc. v. Gateway, Inc.*,
 580 F.3d 1301 (Fed. Cir. 2009)............................................................................................ *passim*

*Maxwell v. J. Baker, Inc.*,
 86 F.3d 1098 (Fed. Cir. 1996)....................................................................................................35

*Philips v. AWH Corp.*,
 415 F.3d 1303 (Fed. Cir. 2005)..................................................................................................26

*Poly-Am., L.P. v. API Indus., Inc.*,
 839 F.3d 1131 (Fed. Cir. 2016)..................................................................................................26

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
 904 F.3d 965 (Fed. Cir. 2018)...................................................................................................3, 4

*Southwall Tech, Inc. v. Cardinal IG Co.*,
 54 F.3d 1570, 34 U.S.P.Q.2d (BNA) 1673 (Fed. Cir. 1995) .......................................................2

*Sprint Communications Co. LP v. Charter Communications, Inc.*
 No. 17-1734-RGA, 2021 WL 982732 (D. Del. Mar. 16, 2021) ...............................................32

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
 247 F.3d 1316 (Fed. Cir. 2001)....................................................................................................1

*Texas Instruments, Inc. v. U.S. Int'l Trade Comm'n*,
 988 F.2d 1165 (Fed. Cir. 1993).....................................................................................................2

*TWM Mfg Co., Inc. v. Dura Corp.*
 789 F.2d 895, 900 (Fed. Cir. 1986)............................................................................................32

*Toshiba Corp. v. Imation Corp.*,
 681 F.3d 1358 (Fed. Cir. 2012)..................................................................................................13

*Trading Techs. Int'l, Inc. v. Open E Cry, LLC*,
 728 F.3d 1309 (Fed. Cir. 2013)..................................................................................................26

*Uniloc USA, Inc. v. Microsoft Corp.*,
 632 F.3d 1292 (Fed. Cir. 2011).....................................................................................................2

*Victronics Corp. v. Conceptronic, Inc.*,
 90 F.3d 1576 (Fed. Cir. 1996)....................................................................................................27

*Virnetx, Inc. v. Cisco Sys., Inc.*,
   767 F.3d 1308 (Fed. Cir. 2014).........................................................................................28

*Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*,
   520 U.S. 17 (1997)..........................................................................................................1, 2

**Rules and Statutes**

35 U.S.C. § 271(a) .................................................................................................................1

35 U.S.C. § 287......................................................................................................35, 36, 37

35 U.S.C. § 287(a) ...............................................................................................................35

LR 7.1.3(c)(2) ......................................................................................................................15

Skenyon, Patent Damages Law............................................................................................33

## I.    **INTRODUCTION**

Plaintiff Wonderland Switzerland AG ("Wonderland") filed this patent infringement action against Defendant Evenflo Company, Inc. ("Evenflo") on December 14, 2018, asserting infringement of three patents.  D.I. 1 at 6-9, namely U.S. Pat. Nos. 7,862,117 ("the '117 patent," JTX-424), 8,087,725 ("the '725 patent," JTX-426), and 8,123,294 ("the '294 patent," JTX-428) (collectively, the "Patents-in-Suit").   During the four-day trial, Evenflo introduced evidence demonstrating that Evenflo's accused EveryStage car seat (the "EveryStage") does not infringe any of the Patents-in-Suit, either literally or under the doctrine of equivalents. Evenflo further established that even if it were determined that the Accused Product infringed any of the Patents-in-Suit, damages for such infringement are considerably less than alleged by Plaintiff.  Evenflo therefore respectfully requests that the Court enter judgment of non-infringement of the Patents-in-Suit in favor of Evenflo.

## II.    **LEGAL STANDARDS**

### A.    **Noninfringement**

A patent is infringed when a person "without authority makes, uses, offers to sell, or sells any patented invention, within the United States … during the term of the patent[.]"  35 U.S.C. § 271(a).  "Literal infringement of a claim exists when every limitation recited in the claim is found in the accused device."  *Kahn v. Gen. Motors Corp.*, 135 F.3d 1472, 1477 (Fed. Cir. 1998).  Any deviation from the claim precludes a finding of literal infringement as a matter of law.  *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001).

### B.    **Doctrine of Equivalents**

A finding of equivalence requires a correspondence between the accused product or process and each and every limitation of the claim, not the claimed invention as a whole. *Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 29 (1997).  The Doctrine of Equivalents

1

cannot be used to vitiate a claim limitation in its entirety to cover a structure that is specifically excluded from the claims. *Warner-Jenkinson*, 520 U.S. at 39 n.8. Argument-based estoppel acts to limit the available range of equivalents. Unmistakable assertions made by the applicant to the Patent Office in support of patentability, whether or not required to secure allowance of the claim, operate to preclude the patentee from asserting equivalency between a limitation of the claim and a substituted structure or step. *Texas Instruments, Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165, 1174 (Fed. Cir. 1993). Such assertions can create estoppel even when the patentee did not amend a patent claim. *Haynes Int'l, Inc. v. Jessop Steel Co.*, 8 F.3d 1573, 1579 (Fed. Cir. 1993). Once an argument is made regarding a claim term so as to create an estoppel, the estoppel will apply to that term in other claims. *Southwall Tech, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 34 U.S.P.Q.2d (BNA) 1673, 1683 (Fed. Cir. 1995); *see also Deering Precision Instr. L.L.C. v. Vector Distr. Sys. Inc.*, 347 F.3d. 1314, 68 U.S.P.Q.2d (BNA) 1716 (Fed. Cir. 2003).

## C.      Damages

The plaintiff in a patent infringement suit has the burden to establish damages. *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011) ("The patentee bears the burden of proving damages."). Where the plaintiff claims reasonable royalties, it must establish the royalty that the defendant would have agreed to pay for a license to the patent-in-suit if the parties had negotiated a license at the time of the first alleged infringement. *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009) (reasonable royalty damages "ascertain the royalty upon which the parties would have agreed had they successfully negotiated an infringement just before infringement began"). In order to arrive at a proper reasonable royalty, the value of the allegedly infringed features must be apportioned relative to the value of all of the other features (patented and unpatented) that drive consumer demand for the accused product. *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 978 (Fed. Cir. 2018)

2

("If the product has other valuable features that also contribute to driving consumer demand—patented or unpatented—then the damages for patent infringement must be apportioned to reflect only the value of the patented feature.").

### III.    NON-INFRINGEMENT

#### A.    The EveryStage Does Not Infringe the Asserted Claims of the '294 Patent.

The EveryStage does not infringe the asserted claims of the '294 patent because it does not have, either literally or under the doctrine of equivalents: (1) the claimed harness storage cavity; (2) a cover forming a smooth support over said harness storage cavity; or (3) a harness storage cavity formed with slots to permit said shoulder straps and said belt straps to project from said harness storage cavity when said cover is closed.

##### 1.    The EveryStage Does Not Have a Harness Storage Cavity Sized to Receive the Harnesses.

Wonderland did not present much evidence, at trial or in its brief, regarding the existence of the '294 patent's "harness storage cavity" limitation. Instead, Wonderland focuses on Evenflo's evidence, and broadly concludes that "there can be no dispute that the accused EveryStage seats contain a harness storage cavity." D.I. 176 at 5. In fact, the evidence presented at trial demonstrates that it is more likely than not that the EveryStage *does not* include an infringing harness storage cavity. More specifically, Wonderland's argument that there is "no claim requirement that the harness storage cavity be intended or designed for th[e] purpose" of storing harnesses and hardware (D.I. 176 at 4) is contradicted by this Court's own ruling on the issue at summary judgment and the plain language of the claims.

The claims of '294 patent require a "harness storage cavity being *sized to receive*" the harness hardware of the car seat. *See, e.g.*, JTX-428 at 6:33-34 (emphasis added). Referencing the "sized to receive" language, the Court stated that the term "harness storage cavity" comprises

3

a "'volume or space for storing harnesses.'"  D.I. 152 at 12.  In coming to this conclusion, the Court explained that the claims teach that a "'harness storage cavity' must be 'sized to receive' the harness buckle and latch members below the cover, which preliminarily indicates that the 'harness storage cavity' was *designed with the purpose of storing harness and latch components* in mind." *Id.* (emphasis added).  The Court further explained that, "[t]aken together, the claim language and specification indicate that the 'harness storage cavity' is designed for the purpose of storing the harness hardware but is not exclusively limited to that function." *Id.*

In this regard, the undisputed evidence at trial showed that the space identified by Wonderland as the harness storage cavity on the EveryStage <u>was not</u> designed for the purpose of storing hardware and was only later, once the design was finished, identified as a place that could fit that hardware.[1]  Evenflo's design engineers testified that the alleged harness storage cavity on the EveryStage was never designed for the purpose of storing harness hardware.  *See* Tr. at 243:2-24, 245:15-246:20, 765:19-25; JTX-132; JTX-142.  In fact, it was not until well after the EveryStage design had been completed and tooled that there was a lunch time "brainstorming" session in which the participants determined that since the in-seat recline mechanism cavity behind the backrest plate had the <u>capability</u> of storing the EveryStage harnesses and associated hardware when converted to a belt positioning booster seat, that that would be an acceptable use for that pre-existing space.  *See, e.g.*, Tr. at 101:10-102:1, 221:20-222:5.[2]

---

[1]    Although Wonderland argued in its opening brief that "Evenflo designed the cavity to store harnesses and instructed its users to store the harness in that cavity when converting to booster mode[,]" the record cites provided in support refer only to Evenflo instructing customers to use the cavity to store harnesses.  D.I. 176 at 4 (citing Tr. at 384:20-385:22, 214:7-24; JTX-2 at EVE-000341).

[2]    The EveryStage CAD files relied upon by Wonderland actually represent the EveryStage as a convertible seat.  Tr. at 198:14-200:22.  Evenflo does not dispute that the final, marketed EveryStage (with booster mode) is represented by those CAD files (to the extent a drawing can),

4

The EveryStage included a cavity that was designed for the purpose of accommodating the in-seat recline feature, and that purpose alone. *See* Tr. at 243:2-24, 245:15-246:20, 765:19-25; JTX-132; JTX-142. Thus, because the cavity on the EveryStage was not designed for the purpose of storing harness hardware, and the cavity was not altered after the decision was made to store hardware there, the cavity on the EveryStage cannot be said to be "sized to receive" harnesses or hardware as that term has been defined. Wonderland does not even attempt to explain this shortcoming. Even ignoring the Court's "designed for the purpose of harness and latch components" language, Wonderland cannot escape the clear language of the claims themselves that includes the intent of having a specifically designed cavity for storing harnesses (thereby distinguishing the '294 patent claims from the teachings of the Meeker reference which utilized existing space designed for other purposes for storing harness components). Tr. at 689:3-690:22; DTX-540 at [0014].

Wonderland's expert, Mr. Myers, confirmed Wonderland's deficiencies in this area testifying that "even if the claim required a certain intent by the product designer[,] … Evenflo designed the cavity to store harnesses …" D.I. 176 at 4. In response to the question of whether it was his "opinion that the cavity [he] referred to as the harness storage cavity was designed for harness storage[,]" Mr. Myers testified that it was his "position and [his] opinion that the harness storage cavity is *intended to be used* as a harness storage cavity and is spelled out in the manual and instructed to customers to use as such." Tr. at 495:5-11 (emphasis added). Mr. Myers' response confirms that a POSA would consider an "intent" element as part of the harness storage

---

except for the absence of a booster seat belt path. However, it is even more evidence that, at the point in development represented by the CAD files (which includes the cavity behind the backrest plate), that nothing on the EveryStage could have been designed for harness storage because there was absolutely no need for harness storage at that time. *Id.*; *see also* JTX-473.

cavity construction. But his response does not answer the question posed, which is unsurprising because Mr. Myers had just heard Evenflo's design engineers testify that the cavity on the EveryStage was *not* designed to store harnesses or hardware. Further, Mr. Myers's answer does not support his conclusion that the EveryStage has the claimed "harness storage cavity" that was designed for that purpose.

Wonderland's argument regarding infringement is also at odds with its arguments regarding invalidity. In its opening infringement brief, Wonderland argues that the EveryStage infringes because "[t]here is no dispute that the accused EveryStage seats' cavity can store harnesses as claimed." D.I. 176 at 4. If the ability to store harnesses is all that is required, then the SafeGuard and Triumph also have the claimed "harness storage cavity" because they too have similar cavities capable of storing harnesses. Tr. at 694:4-9, 695:20-22, 703:25-704:11, 888:1-9, 889:5-13. But, as the Court has already found, those seats do not disclose the claimed "harness storage cavity." D.I. 152 at 12-13. Wonderland relied on the Court's opinion at trial, presenting testimony that its expert agreed with the Court in the context of whether the prior art disclosed a "harness storage cavity." *See, e.g.*, Tr. at 866:22-25.

Wonderland, however, provides no explanation for why it can maintain that the pre-booster-mode EveryStage (prior to the March 10 meeting), which is no different than the post-booster-mode EveryStage except for the booster belt path (Tr. at 199:23-200:14), and the SafeGuard, which has a similar cavity behind a backrest plate that is big enough to store harnesses and hardware, can be distinguished in a way that the EveryStage still infringes while the SafeGuard does not anticipate. The only difference between the EveryStage and the SafeGuard with respect to the alleged "harness storage cavity" is that Evenflo identified the space in a single place in its instructional manual (and not in marketing materials) in the EveryStage and told customers to store

harness hardware in there.   Neither seat was designed to have a cavity to store harnesses and hardware, and neither seat was designed with a cavity that was "sized to receive" the harnesses and hardware.   Wonderland cannot have it both ways.   *See 01 Communique Lab., Inc. v. Citrix Sys., Inc.*, 889 F.3d 735, 742 (Fed. Cir. 2018) (finding nothing "preclude[s] a litigant from arguing that if a claim term must be broadly interpreted to read on an accused device, then th[e] same broad construction will read on the prior art").   And because the SafeGuard does not contain a harness storage cavity, neither does the EveryStage.[3]

### 2.    The EveryStage Does Not Have a Cover Forming a Smooth Support Over a Harness Storage Cavity.

Wonderland's evidence regarding whether the EveryStage has a smooth cover,  as required for asserted claims 1, 6, 8, 10, and 12, consists entirely of its expert's testimony that, because nothing on the cover "scratches or impedes" his hand or causes discomfort for a child, the cover is "smooth."   D.I. 176 at 5-6.   This is insufficient to show literal infringement of this claim limitation by the EveryStage.

Evenflo presented trial evidence that the "cover" over the cavity in the EveryStage has indentations that make it not smooth.   Tr. at 670:10-14, 671:2-9.   Wonderland does not dispute the presence of the indentations (*id.* at 361:7-362:24), instead choosing to label the indentation "small" and "shallow" without supporting record citations.   D.I. 176 at 5.   Because the "cover" indisputably has indentations, Mr. Campbell was correct to testify that the identified EveryStage "cover" is not smooth.   Tr. at 670:22-671:9; *see also* Tr. at 916:14-15 ("THE COURT:  Normally if you have a

---

[3]    Should Wonderland respond by again incorrectly arguing that Evenflo is making a "practicing the prior art" argument, Evenflo is in fact arguing that Wonderland should just be held to its own interpretation of the claims of the '294 patent for both infringement and invalidity. Therefore, if Wonderland cannot identify a meaningful distinction between the cavities of the EveryStage and SafeGuard, it should not be allowed to argue that the EveryStage infringes but the SafeGuard is not anticipatory with respect to the "harness storage cavity" limitation.

channel in something, you wouldn't call that smooth.").

Wonderland also argues that the identified "cover" on the EveryStage is "smooth" because the cover does not result in discomfort to the child. D.I. 176 at 6. This argument requires the Court to find that something is smooth so long as it is comfortable, a construction not supported by the '294 patent or the testimony at trial, which indicates that more than just the "cover" contribute to a child's comfort in a car seat. *See, e.g.*, Tr. at 696:4-7 (noting that pads in car seats are common and contribute to "child comfort"). The Court found that the term "smooth" did not require a construction, rejecting both parties' proposed constructions. D.I. 72 at 6. There are any number of hypothetical structures that may be smooth but not comfortable, and vice versa. Conflating "smooth" and "comfortable" is not supported by the record or common sense.

Notwithstanding the above argument, even if the "cover" itself was considered to be "smooth," Wonderland has failed to present any evidence that the "cover" provides a "smooth support," as is required by the claims, because there is a substantial gap between the "cover" and the bottom of the seat when the headrest is in certain vertical positions. *See* DTX-571 (physical EveryStage car seat with padding removed). Mr. Campbell testified that when the headrest is in the upper positions, the "cover" of the EveryStage "no longer covers the entire storage cavity." Tr. at 669:16-21, 727:12-16. While that gap is covered by a plastic board sewn into the softgoods portion of the seat pad (not part of the seat itself) when the headrest is in the upper positions (*id.* at 669:24 -670:04), Wonderland did not argue or provide evidence that that board (or any portions of the softgoods) comprise any portion of the "cover" it has identified on the EveryStage as meeting the claim limitations.

Finally, Wonderland's argument that that the "cover" on the EveryStage is smooth because Evenflo admitted that the seat complies with federal regulations is not well-taken. D.I. 176 at 4.

Indeed, according to Wonderland itself, those regulations only concern "protrusions on the backrest[,]" *id.*, and have nothing specifically to do with "comfort" and/or "smoothness." Therefore, this argument also fails to demonstrate literal infringement by the EveryStage.

### 3. The EveryStage Does Not Have Slots Formed in the Harness Storage Cavity.

There is no dispute that the EveryStage includes tolerance "gaps" between its backrest plate and seat shell that physically allow harnesses to project out from the cavity behind the backrest plate. Tr. at 724:23-725:19; D.I. 176 at 7. Those gaps, however, do not satisfy the "slots" limitation found in claims 1, 10, 12, 13, and 15 of the '294 patent which require a "harness storage cavity *being formed with slots* to permit said shoulder straps and said belt straps to project from said harness storage cavity when said cover is closed and said harness buckle and latch members are positioned within said harness storage cavity." JTX-428 at 6:35-40 (emphasis added).

Wonderland argues that "[t]he claims only require slots that allow 'said shoulder straps and said belt straps to project from said harness storage cavity when said cover is closed.'" D.I. 176 at 7. However, discussed above, there is more much to the claimed "slots" limitations than their function of allowing harnesses to project out from the cavity. For instance, the slots must be formed in the harness storage cavity. JTX-428 at 6:35-40. There is no dispute here that the EveryStage does not have slots formed in anything. The "slots" identified by Wonderland on the sides of the backrest plate are gaps formed from manufacturing tolerances between the backrest plate and the seat shell. Tr. at 672:2-24. Nothing is formed in anything else. Finding that any of these spaces are "slots" ignores the claim language requiring the slots to be formed in the harness storage cavity.

Likewise, the identified "slot" at the bottom of the backrest plate is merely a space formed between the backrest plate and seat shell that can change size depending on the height of the

9

headrest.  Tr. at 669:16-670:4; DTX-571.  Except for one position in which the space between the backrest plate and seat shell appears to be a narrow opening with harnesses projecting out, the identified lower "slot" changes from anything to non-existent to a large hole depending on the position of the headrest.  Tr. at 669:16-670:4; DTX-571.  This ephemeral space is not "formed in" the cavity as required and, as such, does not literally meet the '294 patent's slot limitation.

Even assuming, *arguendo,* that such gaps on the EveryStage could be said to comprise the claimed slots, Wonderland has presented no argument or evidence as to why the SafeGuard would not also have the claimed slots.  Mr. Myers testified that it is his opinion that the SafeGuard does "not have the claim[ed] slots," but it "certainly [has] openings into that cavity[.]"  Tr. at 887:14-21.  In so stating, Mr. Myers explained that "unless [he] actually saw a harness storage cavity with straps projecting out of it, [he was] not sure [he] c[ould] say whether those are slots.  They are openings and, you know, it depends on the application."  *Id.* at 887:21-25.  Mr. Myers's credibility is undercut by the fact that he immediately acknowledged that he did in fact see Mr. Campbell demonstrate storing the hardware in the cavity behind the backrest plate on the SafeGuard and that the harness straps were projecting out from behind the backrest plate.  *Id.* at 888:1-12.  If Wonderland's position for infringement is that the "slots" limitation is met by the EveryStage because there are gaps sufficient to allow harnesses to project out from behind the backrest plate, Wonderland should be held to the same position for invalidity with respect to the SafeGuard, which also has those gaps.  *See 01 Communique*, 889 F.3d at 742 (citing *Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1380 (Fed. Cir. 2007)).

**4.    Wonderland Has Failed to Prove Infringement of any Claim of the '294 Patent Under the Doctrine of Equivalents.**

Wonderland has failed to prove infringement of claims 1, 6, 8, 10, and 12 based on DOE for the "cover forming a smooth support" limitation.  Wonderland argues that the purpose of the "'smooth' cover" is to make a comfortable seat for the child during transportation.  D.I. 176 at 27. Wonderland further argues that the cover on the EveryStage performs the function of providing comfortable support in substantially in the same way and obtains the same result as the claimed cover.  *Id.*  More specifically, Wonderland argues that the "'H' shaped indentation has no bearing on the function of the cover, the way that function is achieved, or the result."  *Id.*; *see also id.* at 28 (arguing that the EveryStage cover is not "substantially different than the patented cover element" and the "H" is "but a small part of the cover").

The problem with Wonderland's arguments are that they completely ignore the large gap created by the EveryStage's backrest panel and seat shell when the EveryStage headrest is in the uppermost few positions.  Tr. at 669:16-21, 727:12-16; DTX-571.  The EveryStage includes a plastic insert in the backrest pads to provide a cover over the cavity behind the backrest plate when the backrest panel is in a vertical raised position in order to provide "a surface that is comfortable for a child" and "protects the child from the cavity and the harness."  D.I. 176 at 27.  Wonderland did not present evidence at trial, nor does it argue now, that the combination of the backrest panel and plastic insert together are equivalent to the claimed "cover forming a smooth support."  Thus, its DOE argument fails.

Wonderland also argues that the EveryStage infringes claims 1, 10, 12, 13, and 15 of the '294 patent under DOE because the harness straps are able to project out of the harness storage cavity without disconnecting the harness hardware.  D.I. 176 at 28-30.  This appears to be Wonderland's position with respect to literal infringement as well, *compare id.* at 6 (arguing for

11

literal infringement that the EveryStage has the claimed slots because "the openings on the car seat when the cover is closed permit the straps to project from the cavity"), *with id.* at 30 (arguing for DOE that "the accused EveryStage seats have access for the straps to exit the harness storage cavity when the cover is closed"), and so it is not readily understood what is the "equivalent" in Wonderland's DOE argument. Wonderland itself cannot help but define to the equivalent to the claimed slots as "slots." *See id.* at 28 ("The straps project out of the harness storage cavity via the slots shown in JTX-351 at 46[.]"). DOE "is not 'simply the second prong of every infringement charge, regularly available to extend protection beyond the scope of the claims.'" *Amgen Inc. v. Sandoz Inc.*, 923 F.3d 1023, 1029 (Fed. Cir. 2019), *modified on reh'g*, 776 F. App'x 707 (Mem) (Fed. Cir. 2019). This should prove especially true here where the first prong and second prong are the same.

Further, it is unclear what Wonderland is attempting to argue with regard to any specific "configuration" of the "slots" in the EveryStage. D.I. 176 at 30. To the extent Wonderland is arguing that the space at the bottom of the backrest panel is equivalent to a slot even though it never has a static, defined position as a "slot," Evenflo disagrees, and the evidence supports its position. As explained above, the space below the backrest panel only looks like a slot when the headrest is in a certain vertical position. JTX-351 at p.65. In other positions, that space is a very large hole or nonexistent. Tr. at 669:16-21, 727:12-16; DTX-571. Wonderland fails to explain why that space between the bottom of the backrest panel and the seat shell, when it even exists, is equivalent to the claimed "slots" formed in the harness storage cavity.

### 5.    Wonderland Failed to Present Evidence for All Elements of Its Induced Infringement Claims.

Wonderland argues that it has met its burden in demonstrating that Evenflo induced its customers to infringe claims 13 and 15 of the '294 patent by providing manuals that instruct

12

customers on how to convert the EveryStage into booster mode and knew that those actions would induce infringement. D.I. 176 at 13-15.[4] Assuming the EveryStage contains all the necessary components to allow a customer to infringe claims 13 and 15, Wonderland's claim fails because it ignores the other necessary element of induced infringement—that there be an underlying act of direct infringement. *See, e.g.*, *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1363 (Fed. Cir. 2012) ("To prove induced infringement, the patentee 'must show direct infringement, and that the alleged infringer 'knowingly induced infringement and possessed specific intent to encourage another's infringement.'" (citation omitted)). Wonderland argues that its user manual evidence and expert "demonstrate[] that Evenflo's actions led to customer infringement." D.I. 176 at 14. However, there is no evidence in the record about when or if any of the EveryStage customers ever infringed by converting the EveryStage into booster mode.[5] Because Wonderland has failed to point to any evidence of underlying acts of direct infringement by customers in support of its induced infringement claim, the claim fails as a matter of law.

---

[4]    Wonderland argues for a finding of induced infringement specifically for claims 13 and 15 of the '294 patent (D.I. 176 at 13-15), yet in general terms states that it "has demonstrated the literal and induced infringement of the Asserted Claims of the '294, '725, and '117 patents" (*id.* at 23, 40 ("Wonderland has proved by a preponderance of the evidence that Evenflo directly or indirectly infringes all Asserted Claims, and that Wonderland is entitled to damages.")). Wonderland should not be permitted to argue induced infringement as to any asserted claim except claims 13 and 15 of the '294 patent.

[5]    This lack of evidence of customer performance of the claimed method using the EveryStage is also relevant to damages Wonderland claims for induced infringement. *See, e.g.*, *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1334-35 (Fed. Cir. 2009) ("No evidence describes how many Microsoft Outlook users had ever performed the patented method or how many times.").

13

A.       **The EveryStage Does Not Infringe Claim 1 of the '725 Patent**

The EveryStage does not infringe claim 1 of the '725 patent because it does not include, either literally or under the DOE:  (1) a control rack located on a rear surface of a seat back; (2) a lock bar that can be moved into engagement with engagement portions on the control rack; or (3) harness belts that are "connected to" a lock bar that move vertically.[6]

1.       **The EveryStage Does Not Include a Control Rack located on a Rear Surface of a Seat Back.**

What Wonderland identifies as the control rack on the EveryStage is not located on a rear surface of the seat back of the EveryStage.  Mr. Myers identifies the front of the backrest as the "front surface" of the seat back.  Tr. at 390:17-25; see also *id.* at 468:16-20 (describing the front surface as the "occupancy" area).  However, when offering his opinion on what the "rear surface" of the seat back includes, Mr. Myers states that the "rear surface" is everything behind the backrest, including "the componentry and all the things going on behind that wall[,]" but which may or may not include the back of the backrest. *Id.* at 391:7-10, 392:18-25, 468:16-473:6.  On the EveryStage, due to the existence of the in-seat recline mechanism, the "seat back" is the hinged backrest plate discussed extensively above vis-à-vis the '294 patent as the alleged harness storage cavity cover. *Id.* at 664:17-24, 665:14-21.

Wonderland identifies the metal rack that is attached inside the inner structure of the EveryStage car seat as the claimed "control rack." *Id.* at 391:22-392:6.  However, this "control rack" is not located on the rear surface of the seat back as required by claim 1 of the '725 patent, nor could it be, given that the seat back portion of the EveryStage is hinged to accommodate the

---

[6]       Wonderland's brief does not make any DOE arguments with respect to claim 1 of the '725 patent.  Accordingly, it is presumed that Wonderland concedes that only literal infringement applies as to that claim and Evenflo proceeds accordingly herein.

14

in-seat recline feature. *Id.* at 672:9-13. Instead, given the hinged nature of the EveryStage seat back, the Evenflo designers had no choice but to design the "control rack" to be attached further back in the backside corners of the EveryStage substructure and be formed from metal stamped components. *Id.* at 665:14-21, 755:17-22. This is in stark contrast to the "engagement portions" formed on the back surface of the seat back of the car seat disclosed and claimed in the '725 patent. See, e.g., JTX-426 at Fig. 10; Tr. at 475:1-16 (describing structure of the Milestone). As such, it is not mere happenstance that the "control rack" on the EveryStage is not "located on the rear surface of the seat back" as required by claim 1 of the '725 patent – it is a design necessity given the significantly different structure of the EveryStage car seat vis-à-vis the car seat of the '725 patent directly related to the EveryStage's innovative in-seat recline mechanism. Regardless, since the control rack in the EveryStage isn't located on the rear surface of the seat back thereof as required by the claim limitation of claim 1, the EveryStage does not literally meet that limitation and thus doesn't infringe claim 1 of the '725 patent.

### 2.    The EveryStage Does Not Include a Lock Bar that can be Moved into Engagement with Engagement Portions on the Control Rack.

Despite there being a clear dispute between the parties' respective experts (both prior to and at trial) with respect to the "lock bar" limitation, and more specifically, what exactly comprises the alleged "lock bar" on the EveryStage, Wonderland did not address this limitation in its brief. Given these facts, and the clear dispute on the issue, Wonderland's decision not to make even a cursory argument in support of its contentions constitutes waiver. *See* D. Del. LR 7.1.3(c)(2); *see also Endo Pharm. Inc. v. Actavis Inc.*, 2017 WL 3731001, at *13 n.10 (D. Del. Aug. 30, 2017) ("At trial, Defendants presented a second anticipation argument based on Weiss's disclosure of 'pure oxymorphone,' which Defendants argued meant Weiss disclosed oxymorphone HCl with

15

less than five parts per million of the ABUK impurity. (Tr. 42:2-21). Defendants failed to present this second argument in post-trial briefing. Therefore, this argument is deemed waived.")

Regardless of this fact, Wonderland itself seems somewhat undecided as to what it deems comprises the "lock bar" on the EveryStage. At some points, Wonderland and Mr. Myers claim it to be the tube on the Everystage which slidably houses the engagement plungers and which translate in and out to engage the EveryStage control rack. *See* Tr. at 394:17-22. At other times, they claim that many different times, many separate pieces comprise a "lock bar." *Id.* at 394:17-22, 482:25-483:5, 486:2-7. And yet at others, they concede the obvious – namely that all of the aforementioned pieces comprise a "lock bar assembly" not a singular "lock bar" as required by claim 1 of the '725 patent. *Id.* at 481:3-482:19, 485:11-18, 486:11-14.

Indeed, as with the "control rack" issue above, the significant structural differences between the <u>locking assembly</u> in the EveryStage seat (comprised of a tube, having resiliently biased plungers therein, which translate in and out of the tube to engage stamped closed holes in the metal control rack) (Tr. at 303:17-304:20, 307:12-15, 394:17-22) and the <u>lock bar</u> disclosed and claimed in the '725 patent (comprising a solid bar, pivotally mounted to the seat back by a handle which pivots – not translates – into plastic, open ended, plastic engagement portions formed on the back surface of the seat back) are a product of the innovative in-seat recline mechanism Evenflo designed and incorporated on the EveryStage. Indeed, as testified by Mr. Dahle, the lock bar mechanism disclosed and claimed in the '725 patent would not work on the EveryStage, which is at least one reason why those mechanisms are so different. Tr. at 759:12-17, 762:19-763:9.

Regardless of the foregoing, the claim language is clear and claim 1 of the '725 patent explicitly requires a <u>lock bar</u> "that can be moved into engagement with a selected one of said

16

engagement positions" on the identified control rack.  It is undisputed that what Wonderland has identified as the lock bar on the EveryStage (the tube itself) cannot be moved into engagement with a selected one of the engagement positions.  Further still, it is clear that the plungers that are mounted in the tube and actually engage with the identified "control rack" (Tr. at 303:17-304:20, 307:12-15, 394:17-22) are not a "lock bar" – either in how that term is defined, described and used in the '725 patent, or in how a person of ordinary skill in the art would understand that term. Indeed, Wonderland's own construction and use of the "lock bar" term further down in claim 1 of the '725 patent ("harness belts being connected to said <u>lock bar</u>") <u>requires</u> that the aforementioned tube that houses the plungers in the EveryStage be the identified "lock bar."  Thus, the distinction between the "lock bar" as called for in claim 1 of the '725 patent versus the lock bar assembly (or mechanism) incorporated in the EveryStage which <u>requires</u> a finding of no literal infringement. *See, e*.g., *Litton Sys., Inc. v. Honeywell, Inc.*, 140 F.3d 1449, 1454 (Fed. Cir. 1998) ("Literal infringement requires that the accused device contain each limitation of the claim exactly; any deviation from the claim precludes a finding of literal infringement."); *see also Cole v. Kimberly–Clark Corp.*, 102 F.3d 524, 532 (Fed. Cir. 1996) ("In the instant case, since K-C's accused products do not literally meet all of the claim limitations, we hold as a matter of law that there is no literal infringement.").  Accordingly, since the "lock bar" identified by Wonderland clearly does not "move into engagement" with any portion of the identified EveryStage control rack, the identified "lock bar" in the EveryStage does not meet that limitation and the EveryStage does not literally infringe claim 1 of the '725 patent.

        **3.**        **The EveryStage Does Not Include Harness Belts Connected to a Lock Bar that Move Vertically.**

The EveryStage does not include harness belts that are connected to a lock bar such that said harness belts move vertically in response to a corresponding vertical movement of said

17

headrest.  While it is true, when moving vertically upward, that the harness belts may incidentally contact what Wonderland has identified as the lock bar, it is the belt guides, not the "lock bar," that cause the harness belts to move.  Tr. at 662:5-24, 666:21-667:20.  To the extent there is any question as to what "connected to" means as used in claim 1, the Court provided clear guidance in its construction of the "connected" term.  *See* D.I. 72 at 5-6 ("connected" means "in a state of contact between elements sufficient *to cause one element to affect the* position or *operation* of the other element" (emphasis added)).

In this regard, it is noted that when the lock bar is in a location clearly away from contact with the harness belts (such as when it is in the upper positions), the belts do not touch the lock bar.  Tr. at 666:8-667:16.  At least in those positions, even Wonderland agrees that the lock bar is not "connected to" the harness belts. *Id.* at 401:13-402:11.  However, even in the few instances where the lock bar does "incidentally contact" the harness belts, it still is not "connected to" the lock bar in the manner required by the Court's claim construction ruling because it does not "affect the position or the operation" of the harness belts.  *Id.* at 666:21-667:3.  More specifically, as opposed to the lock bar disclosed and claimed in the '725 patent, which is clearly always in contact with the harness belts and is the "but for" cause of their positioning on the child seated in the seat (*see* JTX-426 at Fig. 18 (showing that lock bar 42 and harness 50 are in contact)), the identified "lock bar" in the EveryStage never controls the position of the harness belts vis-à-vis the child – that function is always performed by the belt guides located in the seat back backrest panel.  *Id.* at 662:5-24, 667:17-20, Tr. at 752:24-753:21, 756:4-757:15.

Wonderland argues that the harness belts are "connected" to the lock bar because the incidental contact "affects" the harness belts.  D.I. 176 at 19.  This is insufficient to meet the Court's construction of the claim as requiring connection to affect the "position or operation" of

18

the belts.  Given that the identified "lock bar" neither controls or even affects the "position" of the harness belts vis-à-vis the child (the belt guides do this), the first prong of the Court's "connected to" construction is not met.  Further, there is no evidence, and Wonderland has not even alleged, that the incidental contact affects the "operation" of the harness belts, so the second prong of the Court's construction is not met either.  Accordingly, the identified "lock bar" on the EveryStage isn't "connected to" the harness belts as required by claim 1 of the '725 patent and the EveryStage does not literally infringe claim 1 of the '725 patent

### B.    The EveryStage Does Not Infringe Claim 9 of the '117 Patent.

The EveryStage does not infringe claim 9 of the '117 patent because it does not include, either literally or under the DOE: (1) a seat back with a pair of laterally spaced openings therethrough; (2) a movable guide bar positioned in register with laterally spaced openings in a seat back; (3) a movable guide bar "that directs" harness belts through the openings; and (4) a fixed guide bar "mounted above" the openings.

#### 1.    The EveryStage Does not Have a Seat Back with a Pair of Laterally Spaced Openings Therethrough.

The laterally spaced openings <u>identified by Wonderland</u> relevant to the above-identified limitation are not in the seat back and thus do not literally meet this limitation.  Initially, as discussed fully above, it is axiomatic that a "seat back" is the portion of a seat on which the child's backrests.  Indeed, consistent with above, and as set forth by Mr. Campbell, the EveryStage does have laterally spaced openings located in the seat back – namely the belt guides.  Tr. at 658: 2-25; 659:1-10.  However, these are not the openings identified by Wonderland as meeting this claim limitation, and therefore, allegedly infringing.

The openings that Wonderland identifies as meeting this limitation are not in the seat back, they are in the back of the chassis portion of the seat allowing the harness belts to enter into the

chassis.    Tr. at 752:17-25, 753:1-20.  The car seat chassis is not the seat back – it performs no function related to supporting the back of a child.  In fact, it is not even located in a position where it affects any performance of supporting the child at all.  It is merely the rear structural portion of the EveryStage seat that performs no function related to supporting the child's back.  Accordingly, since the openings identified by Wonderland as meeting the "seat back being formed with a pair of laterally spaced openings therethrough" are clearly not located in the EveryStage seat back as required by claim 9 of the '117 patent, the EveryStage does not literally infringe claim 9 of the '117 patent on at least this basis.

### 2.    The EveryStage Does not Have a Movable Guide Bar Positioned in Register with the Openings.

Wonderland has identified the openings in the EveryStage chassis as the designated "seat back" openings and the locking mechanism tube holding the EveryStage translating locking plungers as the designated "movable guide bar."  Yet, Wonderland has not (and cannot) explain how the identified movable guide bar is "in register" with the identified openings in the seat back cover on the EveryStage.  Indeed, as is clearly set forth in the specification of the '117 patent, the "registration" of the movable guide bar (42) with the entirety of the disclosed and claimed openings (55) can be understood.  '117 patent, col. 6; 52 – 60.  Indeed, as shown even clearer in drawing figures 13 and 21 of the '117 patents (below), the seat back openings (55) provide the exit point for the harness belts to the front of the seat in a similar, although not identical, way as the aforementioned seat belt guides perform the same function on the EveryStage



This contrasts completely with the openings identified by Wonderland on the EveryStage, which do not provide the exit point for the harnesses to restrain the child sitting in the car seat. Instead, as noted above, it is the belt guides that are located on the EveryStage seat back that perform this function and control where the harness belts engage the shoulders of the child seated in the seat. The openings identified by Wonderland on the EveryStage provide an entrance point of the harness belts into the chassis from underneath the car seat from the lower fixed belt attachment point. Tr. at 752:19-23. However, the identified "movable guide bar" on the EveryStage is never "in register" with those openings, nor would there be any reason for them to be, given their entirely distinct function from the openings disclosed and claimed in the '117 patent. Accordingly, because the "movable guide bar" identified by Wonderland is not "in register with" the pair of laterally spaced openings identified by Wonderland on the EveryStage as required by claim 9 of the '117 patent, the EveryStage does not literally infringe claim 9 of the '117 patent.

21

### 3. The EveryStage Does not Have a Movable Guide Bar that Directs Harness Belts through the Openings in the Seat Back.[7]

The bar identified in the EveryStage as the "movable guide bar" does not direct the harness belts through the openings in the seat back for two reasons: (1) the identified openings are not in the seat back; and (2) the identified movable guide bar on the EveryStage was not designed for and does not serve the purpose of "directing" harness belts at all. Indeed, as set forth above, it is clear that the openings identified by Wonderland as being "in the seat back" for both claims are not, in fact, located in the EveryStage seat back. Those arguments are clear and need not be restated.

With respect to the identified "movable guide bar," this is the exact same structure that Wonderland identifies as the "lock bar" with respect to claim 1 of the '725 patent. D.I. 176 at 21. And for many of the same reasons that the "lock bar" in that claim isn't "connected to" the harness belts, the "movable guide bar" in claim 9 of the '117 patent does not "direct" those same harness belts. To the extent there is any question as to what "direct" or "redirect" means as used in claim 9, the Court provided clear guidance in its construction of that "connected" term. D.I. 72 at 5; ("direct" means "control the position of").

As explained above, when the movable guide bar is in a location clearly away from contact with the harness belts (such as when it is in the upper positions), the belts don't even touch the movable guide bar. Tr. at 666:8-667:16. At least in those positions, the movable guide bar clearly cannot "direct" the harness belts. However, even in the few instances where the movable guide bar does "incidentally contact" the harness belts, it still does not "direct" the harness belts in the

---

[7] Claim 9 of the '117 patent recites three instances where the "moveable guide bar" "directs" the positioning of the harness belts through the identified openings in the EveryStage. Evenflo's arguments herein apply to all three such instances.

manner required by the Court's claim construction ruling because it does not "control the position" of the harness belts.  *Id.* at 666:21-667:3.  More specifically, as opposed to the movable guide bar disclosed and claimed in the '117 patent which clearly "directs" the harness belts and is the "but for" cause of their positioning on the child seated in the seat,  the identified "movable guide bar" in the EveryStage never controls the position of the harness belts vis-à-vis the child – that function is always performed by the belt guides located in the seat back backrest panel.  *Id.* at 662:5-24, 667:17-20, 752:24-753:21, 756:4-757:15.

Wonderland argues that the harness belts "direct" the movable guide bar because even the incidental contact "creates tension, which thereby directs the position of the belt."  D.I. 176 at 20-21.  Yet Wonderland makes this argument with no citation whatsoever as to why such tension "directs" the positioning of the belt as required by this Court's construction.  To the contrary, even Wonderland's own expert, Mr. Myers, agrees that it is the belt guides, not the alleged "movable guide bar" that controls the positioning of the harness belts vis-à-vis the child.  Tr. at 467:23-468:1. Accordingly, for at least this reason, the identified movable guide bar on the EveryStage doesn't "direct" the harness belts as required by claim 9 of the '117 patent and the EveryStage does not literally infringe claim 9 of the '117 patent on at least this basis as well.

### 4.     The EveryStage Does Not Have a Fixed Guide Bar Mounted in the Seat Back Above the Openings.

While the EveryStage does include a fixed guide bar that is located near the top of the openings identified by Wonderland, that bar is not "above" the openings in the EveryStage seat back as required by claim 1 of the '725 patent.  Despite this being a fairly clear factual issue, Wonderland still manages to raise arguments to the contrary.  In support of those arguments, though, Wonderland cites only to the convoluted testimony of its expert, Mr. Myers, and CAD drawings which aren't even representative of the actual commercial EveryStage product.  *See infra*

23

at p. 5 n.2. While Mr. Meyers entire testimony on the "above the openings" limitation is generally circuitous and inconsistent, at least the following excerpt is representative of Mr. Myers unwillingness to deviate from his pre-designated script:

> Does a hole in a piece of plastic project up further? Sure it does. Does it create a gap so that the belt can pass over the top of the fixed bar? Yes, I can stipulate to that. But what I will not say is that the opening is up above that bar, I will not say that the opening is anything but below the fixed bar.

Tr.at 437:17-22.

As for the CAD drawings, and even ignoring the issues set forth above, the particular CAD drawings Wonderland included in its brief relevant to this limitation show a plastic sleeve (orange tube) of significant width placed around the fixed guide bar that appears to make the diameter of the EveryStage fixed guide bar much bigger than it actually is. D.I. 176 at 20. This is a piece that was never included on any commercial embodiment of the EveryStage sold by Evenflo and its inclusion in an infringement analysis is clearly improper. *See, e.g.*, *Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1481-82 (Fed. Cir. 1984) ("Infringement is not determined by comparison between parts of the description in a patent and the accused process or product, or by comparison between commercial products sold by the parties. Accused products made, sold, or used, and accused processes performed, before suit must be compared with the claims."); *see also Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993) ("[T]he claim as properly construed must be compared to the accused device or process.") Accordingly, both the testimony of Wonderland's expert and the aforementioned CAD drawings should be disregarded.

Conversely, as confirmed by both Mr. Dahle in his live testimony (Tr. at 754:12-18), and as the Court can do itself (DTX-571), when the physical EveryStage product is examined there is

24

<u>a clear space between the top of the openings identified by Wonderland and the top of the fixed guide bar</u>.  This is not a matter of opinion or argument – it is a fact.

Evenflo does not contest that the fixed guide bar in the EveryStage is located <u>close</u> to the top of the openings identified by Wonderland – it clearly is.  But "near the top" of the openings is not "above" the openings as clearly required by the claims.  At best, the location of the EveryStage's fixed guide bar can best be described as "in" or "within" the openings, as it was by Mr. Campbell.  Tr. at 661:14-16 ("The position of the fixed guide bar in what Mr. Myers has claimed is within the openings, and not above the openings …"); *see also id.* at 660:2-13.  This situation is almost identical to the situation before the Court at summary judgment as to the position of the fixed guide bar vis-à-vis the control rack with respect to alleged infringement of claims 7, 21, and 22 of the '725 patent.  There, the Court found that despite the fixed guide bar on the EveryStage being located very close to the top of the control rack, it was still "unequivocally" not located "above" the control rack and granted Evenflo summary judgment of non-infringement on that basis.  D.I. 152 at 17.  Here the situation is the same, as should be the result.  And while it ultimately does not matter to the finding of literal infringement (as it does for infringement under the DOE, as discussed more fully below), it is noted that this is not a case where the distinction between the fixed guide bar being "above" versus "in" or "within" the openings is of no moment as <u>it is exactly the distinction</u> Wonderland relied upon to gain allowance of the '725 patent over the cited prior art.  Regardless, the fixed guide bar in the EveryStage is <u>clearly</u> not "above" the openings identified by Wonderland in the EveryStage, and the EveryStage does not literally infringe claim 9 of the '117 patent at least on this basis.

25

### 5.   Wonderland Has Failed to Prove Infringement of Claim 9 of the '117 Under the Doctrine of Equivalents

Wonderland argues that if the Court finds that the EveryStage's fixed guide bar is not determined to be literally "above" the identified "openings" as required by claim 9 of the '117 patent, that the Court should nonetheless rule that that limitation is met under the DOE's function/way/result test.  D.I. 176 at 32.  Wonderland's analysis is irrelevant, however, given that infringement of the "above" limitation under the DOE is clearly precluded in light of Wonderland's unmistakable assertions as to the importance of the positioning of the fixed guide bar "above" the openings and how that limitation defined the claims over the fixed guide bar in the cited reference (showing the fixed guide bar located "in" the openings).

More specifically, during prosecution of the '117 Patent, and in response to the Examiner's citation of U.S. Patent Publication No. 2004/0124676 to Kain ("Kain") showing a fixed guide bar mounted "in" the openings, Wonderland expressly argued that "the positioning of the fixed guide bar above the openings in the seat back is *not a mere design choice*, as the operation and function of Applicants' harness mounting system is substantially different than that taught in the Kain reference."  D.I. 58 at 13 (citing Ex. 5 at JA0088) (emphasis added).  In response to those arguments, claim 9 of the '117 patent was allowed.  It is incontrovertible that having made this (successful) argument about the specific positioning of the fixed guide bar "above" the openings to gain allowance of claim 9, that Wonderland is now precluded from recapturing the surrendered claim scope through the doctrine of equivalents.  *See, e.g.*, *Trading Techs. Int'l, Inc. v. Open E Cry, LLC*, 728 F.3d 1309, 1322 (Fed. Cir. 2013) ("Prosecution history estoppel applies as part of an infringement analysis to prevent a patentee from using the doctrine of equivalents to recapture subject matter surrendered from the literal scope of a claim during prosecution.") *see also  Poly-Am., L.P. v. API Indus., Inc.,* 839 F.3d 1131, 1137 (Fed. Cir. 2016); *Philips v. AWH Corp.*, 415

26

F.3d 1303, 1317 (Fed. Cir. 2005); *Victronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582-83 (Fed. Cir. 1996). Wonderland's infringement claim on this basis must fail.

## IV.    DAMAGES

Wonderland had to prove its purported damages at trial. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). It failed to meet this burden because Wonderland's damages expert, Mr. Schoettelkotte failed to: (1) properly consider the comparable license agreements; (2) properly apportion the relative value of the patented and non-patented features of the accused EveryStage product; (3) acknowledge actual profits in favor of expected profits; and (4) correctly apply the "analytical approach" tin his quest to obtain a fatally flawed reasonable royalty rate. Accordingly, if the Patents-In-Suit are found to be valid and infringed, in whole or in part, by the Court, the proposed reasonable royalty conclusion of Evenflo's expert, Ms. Bennis, is the only appropriate measure of damages.

### A.    Wonderland's Expert Improperly Disregarded Two Comparable Licenses.

At trial, the parties' damages experts discussed three pertinent Evenflo licenses: Meeker (DTX 548), Scotty (DTX 549), and Siebert (DTX 550). Wonderland's expert relied upon only a very limited portion of the Meeker agreement, while completely discounting most terms of the Scotty and Siebert agreements, to arrive at an inflated royalty of $8.00 per unit. Such cherry picking of evidence to support a preferred royalty is inappropriate, and thus Mr. Schoettelkotte's conclusions drawn therefrom are inherently faulty. He did this despite conceding that all three agreements relate to childcare products ed.  Tr. at 584:10-13; 586:24-25; 588-89:22-25. Specifically,  the Siebert agreement pertains to Evenflo's SensorSafe technology, a car seat safety feature that was, in fact, included with the EveryStage Gold (tr. at 823) product accused of infringing the Patents-in-Suit, while the Scotty agreement related to strollers (DTX 549 at 2). Given that the focus of the Siebert and Scotty agreements is on related childcare products, just like

27

the Meeker agreement was, the agreements are comparable and relevant to the hypothetical negotiation and should have been considered by Mr. Schoettelkotte. *See Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014) (finding two license agreements directed to technology which led to the claimed invention comparable to the hypothetical negotiation because the license agreements covered related technology).

And while there must be some relationship between the licensed products/technology with those in the "hypothetical negotiation," an "identity of circumstances" has never been required. *Virnetx,* 767 F.3d at 1330. Indeed, the Federal Circuit has repeatedly found that licenses somewhat different from the circumstances in the hypothetical negotiation may be considered where the expert has accounted for similarities and differences. *See Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014) ("[C]omparable licenses may cover more patents than are at issue in the action, include cross-licensing terms, cover foreign intellectual property rights, or, as here, be calculated as some percentage of the value of a multi-component product."); *see also Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211-12 (Fed. Cir. 2010) (affirming damages award based on a license which involved a lump sum rather than a running royalty and differing competitive relationships where the expert discussed and considered the differences between the agreement and the hypothetical negotiation). Evenflo has no "burden" to prove otherwise "as a matter of law," as Wonderland claims (without citation) in its post-trial brief. D.I. 176 at 34-45. Moreover, Wonderland's citation to *Lucent* is inapposite. There, the Federal Circuit rejected the licenses because some were from "vastly different situation[s]" and for others, the subject matter of the licenses was unclear from the evidence presented at trial. *Lucent*, 580 F.3d at 1328. In contrast, Evenflo's expert, Ms. Bennis, analyzed each of the licenses and explained at trial the

28

aspects that made them comparable vis-à-vis the hypothetical negotiation while also discussing the relevant differences.  Tr. at 802:23-803:20; 822:15-826:14.

Despite Wonderland's *ipso facto* to the contrary, the only reason for Mr. Schoettelkotte completely dismissed the Siebert and Scotty agreements (and only partially relied on the Meeker agreement) is because the royalty rates therein make clear that his $8.00 royalty rate per unit is a completely inflated outlier, and far from a "reasonable" royalty rate.  Specifically, the royalty rate in Siebert (exclusive) ranges from .3% to 1.6% of the average sales prices (around $0.50 to $3 per unit).  Tr. at 823, DTX 550 at 4-6.  The royalty rate in Scotty (exclusive) comprises 3% of the net sales prices (around $2.40 per unit).  Tr. at 824; DTX 549 at 4-5.   And the royalty rate in Meeker (exclusive) ranged between 1.5% or 2% per product, regardless of the number of patents licensed.  Tr. at 584, DTX 548 at 3.  Yet, despite these facts, Mr. Schoettelkotte came to the conclusion that Evenflo would have agreed to a royalty rate of 5.4% for a non-exclusive license on features that did not drive product sales, with no reasonable explanation as to why.  Tr. at 570-71.  Conversely, Ms. Bennis testified, it would be illogical for Evenflo to agree to a royalty rate grossly higher than rates it has agreed to in the past in license agreements spanning decades, especially for a non-exclusive license.  Tr. at 591.  In fact, the rate Evenflo would have supposedly agreed to, according to Mr. Schoettelkotte, tr. at 570-71, is upwards of 300% or more the royalty rates called for in the comparable agreements.  Tr. at 584-85.

### B.    The Remainder of Wonderland's Expert's Analysis was Speculative and Lacked Evidentiary Support.

The analysis Mr. Schoettelkotte provided at trial was plagued by other fatal defects. First, it was built on a foundation of speculation as to profits, non-financial losses, and relative benefits of the patented features. And second, it lacked substantial evidence of those purported benefits, relative use, and desirability by customers.

29

As an initial matter, the Evenflo financials Mr. Schoettelkotte presented at trial were generally apples to oranges comparisons.  As Ms. Bennis pointed out, and as reflected in questions the Court asked, Mr. Schoettelkotte mixed analyses of expected profits with actual profits (tr. at 827:20-830:3), selectively analyzed subsets of the accused products (tr. at 807:24-813:7), and compared actual sales of the predecessor product, the Symphony, with estimated sales of the accused products (tr. at 801:2-802:10), where, in reality, Evenflo earned no incremental profit on the accused products (tr. at 793:6-794:2; 825:19-22), all in an effort to justify his exorbitant royalty rate.

With respect to his profit analysis, Mr. Schoettelkotte's proposed $8.00/unit royalty rate is higher than Evenflo's projected profits at the date closest to the date of the hypothetical negotiation.  Tr. at 800:15-20.  As explained by Ms. Bennis, Mr. Schoettelkotte used the additional profit of the EveryStage LX over the average Evenflo profit on a wide range of products as one of his royalty rate indicators.  Tr. at 799-800.  But his analysis is improper because it was calculated using numbers from 2017 when the hypothetical negotiation was in June 2018.  Tr. at 799-800.  Had Mr. Schoettelkotte relied on the projected profit for the EveryStage as of April 2018, the numbers available closest in time to the hypothetical negotiation, he would have found that Evenflo's projected profit for the EveryStage was lower than the company's overall projected profit.  Tr. at 800:15-20.  Mr. Schoettelkotte's reliance on numbers from 2017 to calculate a reasonable royalty as of June 2018 improperly skewed the royalty rate upward.

Mr. Schoettelkotte's reliance on a $28.23 royalty rate for the EveryStage gross margin was similarly flawed.  Mr. Schoettelkotte arrived at that number by multiplying the April 2017 EveryStage LX projected price of $142.59 with the Evenflo gross margin number, which he calculated to be 19.8%.  Tr. at 791.  This is not, however, a proper comparison.  The 19.8% is the

30

combined margin for the EveryStage LX, DLX, and Gold, yet Mr. Schoettelkotte applied this number to the projected price of the LX only.  Tr. at 792.  This resulted in an improperly high gross margin calculation.  *See* tr. at 792:19-24.  Indeed, as Ms. Bennis explained, the actual gross margin of the LX was $23.96, tr. at 792, and, as the Court rightly observed, it was improper for Mr. Schoettelkotte to compare "apples to oranges" in this calculation.  Tr. at 573-74.

As for Mr. Schoettelkotte's remaining royalty rate indicators, they are improper because he relied solely on expected profits, not actual profits, despite the *Georgia-Pacific* factors calling for an analysis of actual numbers.  *Georgia-Pacific* directs experts to consider the established profitability of a product in calculating the reasonable royalty.  *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).  Yet Mr. Schoettelkotte only compared the expected profits of the EveryStage with the actual profits of the Symphony.  For example, Mr. Schoettelkotte calculated his $5.28 royalty rate indicator by comparing the actual profit of the Symphony from June 2018 through February 2020 to the expected profits of the EveryStage as of April 2017.  Tr. at 801.  As Ms. Bennis explained, not only are the time periods mismatched, but Mr. Schoettelkotte only used expected profits of the EveryStage and ignored actual performance – which was quite different from expected performance.  Tr. at 801-02.

Wonderland's criticism of Ms. Bennis on these issues are unavailing, particularly that she purportedly "compared the Symphony and EveryStage profit from two *dissimilar* time periods." D.I. 176 at 36.  To the contrary, Ms. Bennis looked at the Symphony's gross margin when it was the main product on the market to the gross margin of the EveryStage when it was intended to begin to replace the Symphony on the market (which it never actually did).  Tr. at 793:6-796:23. Wonderland's attempt to use a Symphony number from a time when the EveryStage had already eaten into the Symphony's profits and market share (D.I. 176 at 37) is inappropriate and

31

Wonderland does not cite any case law in support of its slanted view.[8]  Finally, the weight given to the fact that the EveryStage being a singular "hero" product by Mr. Schoettelkotte was simply an excuse his inappropriate evaluation of the actual numbers, and it was repeatedly rebutted by the testimony of Evenflo's witnesses at trial.  Tr. at 611:18-614:11 (conceding that many Evenflo products are considered and referred to as "hero" products).

With respect to the relative value of the features allegedly covered by the Patents-In-Suit vis-à-vis the other features of the EveryStage, Mr. Schoettelkotte admitted that he did not conduct or review any consumer surveys about relative benefits, relative use, or desirability of the patented features; in other words, he did not know how important the allegedly patented features were to consumers, or if they were important at all.  Tr. at 579-82.  The one customer review he did consider (JTX-378) was entirely unreliable as Mr. Schoettelkotte conceded that he did not know who authored the review, whether the reviewer had been paid, or whether the review even pertained to a sale or activity in the U.S.  Tr. at 581-82.  Likewise, Mr. Schoettelkotte provided no evidence or other support for his contentions that Wonderland has somehow lost convoyed sales.  See Tr. at 597:15-599:18.  Indeed, Mr. Schoettelkotte conceded that he had no support for the

---

[8]     Wonderland's citation to *TWM Mfg Co., Inc. v. Dura Corp.*, is inapplicable.  D.I. 176 at 38.  In that case, the court rejected defendant's efforts to downplay the applicability of projected profits from a pre-infringement internal memorandum in favor of post-infringement actual profits because defendant lost documents that precluded plaintiff from showing lost profits and because defendant used the memorandum to decide whether to manufacture and market the infringing device.  789 F.2d 895, 900 (Fed. Cir. 1986).  Here, no such extraneous facts apply to preclude consideration of actual profits.  Moreover, the *Georgia-Pacific* factors call for an analysis of actual profits, which Mr. Schoettelkotte failed to do.  *Georgia-Pacific*, 318 F. Supp. at 1120. As for Wonderland's citation to *Sprint Communications Co. LP v. Charter Communications, Inc.*, that case is irrelevant because the procedural history is different.  C.A. No. 17-1734-RGA, 2021 WL 982732 (D. Del. Mar. 16, 2021).  There, the court denied defendants' motion to exclude plaintiff's damages expert, who offered an opinion based on the analytical approach, finding that defendant could challenge the expert's opinion through cross examination and an opposing expert's opinion. *Id.* at *10-11.  That is far different from upholding a damages amount based on an expert's analytical approach reasoning.

upward impact to the royalty rate based on convoyed sales or suffered other harms such as loss of goodwill, consumer demand or reputation. Tr. at 572:7-18. Nonetheless, he did not back away from those assertions at trial (*id.*), leaving questions as to how much of his overall number can be attributed to factors for which Wonderland provided no evidence.

      **C.**        **Mr. Schoettelkotte's "Analytical Approach" Analysis Is Flawed and Unreliable**

To calculate a reasonable royalty under the analytical approach preferred by Mr. Schoettelkotte, the patentee must "calculate[] damages based on the infringer's own internal profit projections for the infringing item at the time the infringement began, and then apportion[] the projected profits between [itself] and the infringer." *See Lucent*, 580 F.3d at 1324 (*quoting* Skenyon, Patent Damages Law & Practice § 3:4, at 3–9 to 3–10 (2008)). The problems with Mr. Schoettelkotte's analysis of Evenflo's estimated profits are set forth above. In addition, however, Mr. Schoettelkotte failed to appropriately apportion between both demand created by, and relative benefits derived from, the patented features as opposed to non-patented features. Accordingly, his entire analysis under the "analytical approach" is unreliable and should be disregarded.

Specifically, and despite Wonderland's contentions to the contrary, Mr. Schoettelkotte's analysis did not isolate the patented features in any way (*see* D.I. 176 at 35). For example, Mr. Schoettelkotte concluded that his 3.7% difference in projected profitability between the Symphony and EveryStage was exclusively the result of the allegedly infringing patented features that were added to the EveryStage. D.I. 176 at 35 (citing tr. at 601:7-15). But Mr. Schoettelkotte's analysis summarily dismisses that it was the in-seat recline feature of the EveryStage that actually drove marketing and subsequent consumer demand and/or profit projections (not for example, the harness storage capability, a feature only discussed in the instruction manual). Tr. at 601:7-604:4. Indeed, Evenflo marketing employees testified that the in-seat recline and EasyClick drove sales

33

for the EveryStage, not the headrest/harness adjust and/or in-seat harness storage features.  731:18-744:25; 813:10-814:8; 243:16-24.  Moreover, Mr. Schoettelkotte failed to appropriately weigh the fact that the Symphony not only outsold the EveryStage, but it was more profitable as well, even though the EveryStage allegedly incorporated the patented features that the Symphony did not have.  Tr. at 794:3-15; 821:25-822:7.   Moreover, Mr. Schoettelkotte's analysis apparently didn't even consider the fact that the harness storage feature allegedly covered by the '294 patent wasn't even advertised by Evenflo and had no effect whatsoever on consumer demand.  (Tr. at 742:5-744:22).  Mr. Schoettelkotte's baseless conclusion that the allegedly infringing features of the EveryStage drove demand (which comprised the foundation of his "analytical approach" analysis) renders his entire analysis unreliable.

Mr. Schoettelkotte's analysis also improperly split the $8.00 royalty rate evenly between the harness headrest feature and the storage feature, with no evidence supporting the idea that the importance of the two features should be valued equally.  As Ms. Bennis explained at trial, the value of the two features is, in fact, not comparable because the features were marketed and ultimately used by consumers differently.  Tr. at 808.  Indeed, as for the harness storage feature, Ms. Bennis explained that the feature was not only marketed less than the harness/headrest adjust feature (in fact, it was not marketed at all (742:5-744:22)), but it was also likely to be used less because the heavy wear and tear on child seats meant that the seat often needed to be replaced before the harness storage feature would even be used.  Tr. at 809.  Mr. Schoettelkotte considered none of this.  Unlike Mr. Schoettelkotte, Ms. Bennis gave proper weight to each of these features.  She also provided a nuanced opinion, testifying that that the parties would have likely agreed to a higher royalty rate for the harness/headrest adjust feature than the harness storage feature based on the relative values thereof.  Tr. at 811.

34

VII.   **MARKING**

It is undisputed that Graco's practicing products relevant to the patents-in-suit were not properly marked.  D.I. 176, pg. 38 ("It is undisputed that Graco did not mark its [practicing] products with designations for the patents-in-suit").  It is also undisputed that if a patentee fails to properly mark pursuant to 35 U.S.C. § 287, and does not otherwise provide affirmative notice to the alleged infringer of the patents, that damages do not begin to accrue until such notice is provided.  *Id. citing Gart v. Logitech Inc.*, 254 F.3d 1334, 1345 (Fed. Cir. 2001).  For this reason, the start of the period for assessing damages in the present case, if any, should be the date used by Ms. Bennis, namely December 18, 2018, the filing date of the present Complaint.  (D.I. 1; *see also* Bennis Report).

Wonderland's arguments as to Evenflo's alleged burden with respect to the marking issue significantly misstate the law and are completely without merit.  Initially, Wonderland's arguments completely ignore that it is Wonderland's burden, not Evenflo's, to prove it provided notice under 35 U.S.C. § 287(a).  *See Arctic Cat Inc. v. Bombardier Recreational Prods.*, 876 F.3d 1350, 1366 (Fed. Cir.2017) *citing Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996); see also Dunlap, 152 U.S. at 248 ("[T]he duty of alleging and the burden of proving either [actual or constructive notice] is upon the [patentee].").   Accordingly, since Wonderland did not plead, and made no effort to prove, that it provided 35 U.S.C. § 287(a) notice to Evenflo (either actual or constructive) of the Patents-In-Suit prior to the filing date of the Complaint, it is not entitled to damages accruing prior to that date – period.

Wonderland attempts to make an issue of what Evenflo's burden might have been had Wonderland actually pled or attempted to prove that it had properly marked under § 287 (thereby providing constructive notice to Evenflo of the Patents-In-Suit) and Evenflo then proceeded to challenge Wonderland's alleged compliance therewith.  *See Arctic Cat* at 1368.  As set forth fully

35

in *Arctic Cat*, where such a situation exists, the alleged infringer bears a very low "burden of production" of providing only notice to the patentee:

> We hold an alleged infringer who *challenges* the patentee's compliance with § 287 bears an initial burden of production to articulate the products it believes are unmarked "patented articles" subject to § 287. To be clear, this is a low bar. The alleged infringer need only put the patentee on notice that he or his authorized licensees sold specific unmarked products which the alleged infringer believes practice the patent. The alleged infringer's burden is a burden of production, not one of persuasion or proof.

> *Id.* (emphasis added).

Such a burden shift never happened here because, as noted above, Wonderland never pled or even attempted to prove that it had complied with the marking requirements of 35 U.S.C. § 287. D.I. 1.   However, even if it had, Evenflo's actions would have satisfied the "low bar" burden of production called for in *Arctic Cat*.  In its initial set of interrogatories, Evenflo specifically asked Wonderland to identify all marking efforts and/or practicing products marked under 35 U.S.C. § 287.  D.I. 27.  In response to those interrogatories, Wonderland affirmatively confirmed that it had not complied with the § 287 marking requirements.  D.I. 34.  Accordingly, Evenflo's interrogatory, and Wonderland's response thereto, clearly would have satisfied the "low bar" burden of production called for in *Arctic Cat* thereby shifting the trial burden back to Wonderland to prove that the unmarked products did not, in fact, practice the Patents-In-Suit.

This, however, is not even a case where there is an issue as to whether the asserted claims of the Patents-In-Suit cover the unmarked products (as was the case in *Arctic Cat*).  As noted above, Wonderland expressly admitted that it failed to comply with the § 287 marking requirements.  Moreover, Wonderland's own expert provided an extensive infringement analysis detailing that at least the unmarked Graco Milestone car seat practiced every asserted claim of the Patents-In-Suit.  Tr. at 429:5-18; 453:19-24; 497:6-10; s*ee also Arctic Cat* at 1369 ("The district

36

court erred when it placed this burden on the alleged infringer. BRP shouldered only a burden of production to identify unmarked products that it alleges should have been marked. It was Arctic Cat's burden to prove those products—once identified—do not practice the patent-at-issue."). Given Wonderland's failure to plead, much less prove, its initial burdens under 35 U.S.C. § 287, as well as the fact that its arguments are <u>directly contrary</u> to both its own interrogatory responses and the testimony of its own expert, it is difficult to fathom Wonderland's decision to even raise this issue.

## VIII.  **CONCLUSION**

Evenflo has shown on every front that Wonderland has failed to carry its burdens with respect to infringement (both literally and under the doctrine of equivalents) with respect to the Patents-In-Suit as well as to damages. The Court should therefore find in favor of Evenflo.

<table>
<tr><td></td><td>MORRIS, NICHOLS, ARSHT & TUNNELL LLP</td></tr>
<tr><td></td><td><em>/s/ Jeremy A. Tigan</em></td></tr>
<tr><td>OF COUNSEL:</td><td>_____<br>Jack B. Blumenfeld (#1014)</td></tr>
<tr><td>John M. Mueller<br>BAKER & HOSTETLER LLP<br>312 Walnut Street, Suite 3200<br>Cincinnati, OH  45202-4074<br>(513) 929-3400</td><td>Jeremy A. Tigan (#5239)<br>Sarah E. Simonetti (#6698)<br>1201 North Market Street<br>P.O. Box 1347<br>Wilmington, DE  19899<br>(302) 658-9200</td></tr>
<tr><td>Jeffrey J. Lyons<br>BAKER & HOSTETLER LLP<br>1201 North Market Street, 14th Floor<br>Wilmington, DE  19801<br>(302) 468-7088</td><td>jblumenfeld@morrisnichols.com<br>jtigan@morrisnichols.com<br>ssimonetti@morrisnichols.com<br><br><em>Attorneys for Defendant</em></td></tr>
<tr><td>April 21, 2021</td><td></td></tr>
</table>

**CERTIFICATE OF SERVICE**

I hereby certify that on April 21, 2021, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on April 21, 2021, upon the following in the manner indicated:

| | |
|---|---|
| Steven J. Balick, Esquire<br>Andrew C. Mayo, Esquire<br>ASHBY & GEDDES<br>500 Delaware Avenue, 8th Floor<br>Wilmington, DE 19801<br>*Attorneys for Plaintiff* | *VIA ELECTRONIC MAIL* |
| Michael J. Songer, Esquire<br>Shamita Etienne-Cummings, Esquire<br>David M. Tennant, Esquire<br>WHITE & CASE LLP<br>701 Thirteenth Street, NW<br>Washington, DC 20005-3807<br>*Attorneys for Plaintiff* | *VIA ELECTRONIC MAIL* |
| Bijal Vakil, Esquire<br>Henry Y. Huang, Esquire<br>WHITE & CASE LLP<br>3000 El Camino Real<br>Palo Alto, CA 94306-2109<br>*Attorneys for Plaintiff* | *VIA ELECTRONIC MAIL* |

*/s/ Jeremy A. Tigan*

_____

Jeremy A. Tigan (#5239)